FILED
United States Court of Appeals
Tenth Circuit

January 28, 2008

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

KAREN DUDNIKOV, and MICHAEL
MEADORS,

      Plaintiffs-Appellants,

v.

CHALK & VERMILION FINE ARTS,
INC., a Delaware corporation, and
SEVENARTS, LTD., a British
corporation,

      Defendants-Appellees.

No. 06-1458

---

**Appeal from the United States District Court
for the District of Colorado
(D.C. No. 05-cv-02505-WDM-MEH)**

---

Gregory A. Beck, Public Citizen Litigation Group, Washington, D.C., for
Plaintiffs-Appellants.

Scott C. Sandberg, Snell & Wilmer, LLP, Denver, CO, for Defendants-Appellees.

---

Before **McCONNELL, EBEL,** and **GORSUCH**, Circuit Judges.

---

**GORSUCH**, Circuit Judge.

---

    Plaintiffs are eBay "power sellers." Through the Internet auction site, they

sell a variety of fabrics from their home in Colorado. This case concerns two of

plaintiffs' prints, both of which play on famous images by the artist Erté, *Symphony in Black* and *Ebony on White*. While Erté's images depict elegant women walking aquiline dogs, plaintiffs' prints portray Betty Boop next to her aptly named canine companion, Pudgy.

Defendants, owners of the rights to the Erté images, saw plaintiffs' eBay auction page (which disclosed plaintiffs' Colorado location), and came to the conclusion that plaintiffs' prints infringed their copyrights. Defendants promptly contacted eBay in California and successfully suspended plaintiffs' auction, an action that allegedly had adverse consequences for plaintiffs' business and future dealings with the auction site. By e-mail, defendants also threatened plaintiffs with suit in federal court. Before defendants could carry out that threat, however, plaintiffs initiated this action in federal district court in Colorado seeking a declaratory judgment that their prints do not infringe defendants' copyrights. Defendants responded with a motion to dismiss, arguing that the court lacked personal jurisdiction over them. The district court concurred and dismissed plaintiffs' complaint. For reasons we explore below, we reverse.

I

Taken in the light most favorable to plaintiffs, as they must be at this stage in the litigation, the facts of this case establish that Karen Dudnikov and Michael Meadors, a husband-and-wife team, operate a small and unincorporated

- 2 -

Internet-based business from their home in Colorado. Together, they sell fabric and handmade crafts such as aprons, blankets, and placemats under the name "Tabber's Temptations." The majority of their income is derived from selling these products on eBay, whose operations are based in California. Tabber's Temptations is described by eBay as a "power seller," and has received over 6,000 "feedback messages" in the past year from its eBay customers, and over 13,000 positive feedback messages since 1998. Ms. Dudnikov's and Mr. Meadors's eBay auction pages clearly list the location of their merchandise as Hartsel, Colorado, and link to their personal website which contains more information about their business, including its location in Colorado.

In October 2005, Ms. Dudnikov and Mr. Meadors launched an auction on eBay offering fabric for sale with the imprint of the cartoon character Betty Boop wearing various gowns. One of these gowns, Ms. Dudnikov and Mr. Meadors concede for purposes of defendants' motion to dismiss, is easily recognizable as a design of the artist known as Erté, a 20th century Russian-born French artist and fashion designer. In Erté's original works, *Symphony In Black* and *Ebony On White*, a tall, slender woman is pictured wearing a floor length form-fitting dress that trails her feet, and holding the leash of a thin, regal dog. The fabric offered for sale by Ms. Dudnikov and Mr. Meadors replaced the rather elegant woman in

Erté's images with the rather less elegant Betty Boop, and substituted Erté's

svelte canine with Betty Boop's pet, Pudgy.

SevenArts, a British corporation, owns the copyright in these Erté works.

Chalk & Vermilion, a Delaware corporation with its principal place of business in

Connecticut, is SevenArts' American agent. Chalk & Vermilion is also a member

of eBay's "Verified Rights Owner" ("VeRO") program.[1] Under this program,

eBay will automatically terminate an ongoing auction when it receives a notice of

claimed infringement ("NOCI") from a VeRO member stating, under penalty of

perjury, that it has a good-faith belief that an item up for auction infringes its

copyright. The complaint, if unresolved, can also result in the suspension of the

seller's account. Under the VeRO program, a targeted seller may file a "counter

notice" with eBay contesting the validity of the copyright claim. Upon receipt of

such a filing, eBay notifies the initial complainant that it will reinstate the

contested auction in 10 days unless it is notified that there is pending legal action

---

[1] Ms. Dudnikov and Mr. Meadors contend that the VeRO program was created to take advantage of the safe harbor provision of the Digital Millennium Copyright Act ("DMCA"), 17 U.S.C. § 512, which absolves an Internet Service Provider ("ISP") of liability for infringing material posted by a user as long as the ISP takes down the allegedly infringing copyrighted material in response to a notice of claimed infringement. Despite the similarities between the DMCA requirements and the VeRO program, defendants assert that "eBay makes no reference to the DMCA in its statement of the VeRO program." We need not resolve this issue, however, as the origins of the VeRO program are irrelevant for this appeal.

seeking to adjudicate the parties' rights. If the complaining party does initiate legal proceedings within 10 days, eBay will continue to suppress the contested auction pending the outcome of litigation.

Invoking the VeRO program on behalf of SevenArts, Chalk & Vermilion filed a NOCI with eBay contesting plaintiffs' sale of the Betty Boop fabric. In turn, eBay cancelled the auction and notified Ms. Dudnikov and Mr. Meadors of the NOCI. Ms. Dudnikov then contacted Chalk & Vermilion and SevenArts by e-mail to ask that the NOCI be withdrawn. Ms. Dudnikov indicated that she would voluntarily refrain from relisting the disputed fabric, but said that she was worried about having a black mark on her eBay record as a result of having a NOCI filed against her. "I make my living on eBay. I have a 99.9% satisfaction rating . . . . Your action puts my business in danger of going under. Nothing to you perhaps but everything to me." Applt's App. at 39. When SevenArts declined to withdraw the NOCI, plaintiffs submitted a counter notice to eBay contesting the validity of SevenArts' copyright claim. In response, SevenArts notified Ms. Dudnikov by e-mail that, in order to prevent the auction from being reinstated under eBay procedures, it intended to "file an action in the federal court[s]" within 10 days. *Id.* at 44.

Six days after receiving this notice, and before defendants followed through on their threat to sue, Ms. Dudnikov and Mr. Meadors filed a *pro se* complaint in

the United States District Court for the District of Colorado. Their suit sought a declaratory judgment clarifying that their sale of the contested Betty Boop fabric did not infringe defendants' copyrights, and an injunction preventing defendants from interfering with future sales of the fabric.

SevenArts and Chalk & Vermilion responded by entering a special appearance and moving to dismiss for lack of personal jurisdiction.[2] In a very thorough opinion, the magistrate judge assigned the case for a recommended disposition, *see* 28 U.S.C. § 636(b)(1)(A), reasoned that, while the court lacked general jurisdiction over defendants, specific jurisdiction did exist. Defendants objected to the magistrate judge's recommendation and the district court sustained their objection, held that neither specific nor general jurisdiction existed, and thus granted defendants' motion to dismiss. Ms. Dudnikov and Mr. Meadors now appeal the dismissal of their action, though they contest only the district court's disposition of the specific jurisdiction question.

## II

In conducting our review, we are mindful that plaintiffs bear the burden of establishing personal jurisdiction. *Intercon, Inc. v. Bell Atl. Internet Solutions,*

---

[2] Defendants also moved to dismiss for improper venue, but the only basis for challenging venue in copyright actions is that the absence of personal jurisdiction in a forum renders venue improper. *See N. Am. Philips Corp. v. Am. Vending Sales, Inc.*, 35 F.3d 1576, 1577, n. 1 (Fed. Cir. 1994). Accordingly, the question of venue is essentially swallowed by the jurisdictional analysis.

*Inc.*, 205 F.3d 1244, 1247 (10th Cir. 2000). The extent of their burden, and the scope of our appellate review, however, depend in part on the nature of the district court's response to defendants' motion seeking dismissal for lack of personal jurisdiction. A district court has discretion to resolve such a motion in a variety of ways – including by reference to the complaint and affidavits, a pre-trial evidentiary hearing, or sometimes at trial itself.[3]

When, as here, personal jurisdiction is found wanting on the basis of the complaint and affidavits, our review of the district court's dismissal is *de novo*, taking as true all well-pled (that is, plausible, non-conclusory, and non-speculative, *see Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964-65 (2007)) facts alleged in plaintiffs' complaint. Similarly, any factual disputes in the parties' affidavits must be resolved in plaintiffs' favor. *FDIC v. Oaklawn Apartments*, 959 F.2d 170, 174 (10th Cir. 1992). We have further held that, at this stage, plaintiffs need only make a *prima facie* showing of personal jurisdiction. *Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995).[4]

---

[3] Of course, even if personal jurisdiction is contested and found initially on the pleadings and by affidavit, it may be reviewed again at subsequent stages in the trial court proceedings as evidence accumulates. *See FDIC v. Oaklawn Apartments*, 959 F.2d 170, 174 (10th Cir. 1992).

[4] Few such solicitous rules apply in the district court when personal jurisdiction is assessed in an evidentiary hearing or at trial; in such cases, the plaintiff generally must establish, by a preponderance of the evidence, that personal jurisdiction exists. *Dennis Garber & Assoc., Inc. v. Pack-Tech Int'l*

(continued...)

Turning to the test for personal jurisdiction to which these rules of review apply, our analysis begins with two questions. First, we ask whether any applicable statute authorizes the service of process on defendants. Second, we examine whether the exercise of such statutory jurisdiction comports with constitutional due process demands. *Trujillo v. Williams*, 465 F.3d 1210, 1217 (10th Cir. 2006).

On the first of these scores, neither the federal Copyright Act, 17 U.S.C. § 101 *et seq.*, nor the Declaratory Judgment Act, 28 U.S.C. § 2201 *et seq*, provides for nationwide service of process, so Fed. R. Civ. P. 4(k)(1)(A) commands the district court (and us) to apply the law of the state in which the district court sits. Colorado's long-arm statute, in turn, confers the maximum jurisdiction permissible consistent with the Due Process Clause. *Archangel Diamon Corp. v. Lukoil*, 123 P.3d 1187, 1193 (Colo. 2005). Thus, in our case, the first, statutory, inquiry effectively collapses into the second, constitutional, analysis.

The Supreme Court has held that, to exercise jurisdiction in harmony with due process, defendants must have "minimum contacts" with the forum state, such that having to defend a lawsuit there would not "offend traditional notions of fair

---

[4](...continued)
*Corp.*, 115 F.3d 767, 773 (10th Cir. 1997).

- 8 -

play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted). Because a state's sovereignty is territorial in nature, a defendant's contacts with the forum state must be sufficient such that, notwithstanding its lack of physical presence in the state, the state's exercise of sovereignty over it can be described as fair and just. A venerated principle to be sure, it is also one that has long eluded a definitive legal test and proven fertile ground for debate by law students, lawyers, and judges alike.[5] Because plaintiffs do not appeal the district court's adverse ruling on general jurisdiction, however, we are able at least to cabin our inquiry in this case to what "minimum contacts" means for purposes of specific jurisdiction.

In this arena, the Supreme Court has instructed that the "minimum contacts" standard requires, first, that the out-of-state defendant must have "purposefully directed" its activities at residents of the forum state, and second, that the plaintiff's injuries must "arise out of" defendant's forum-related activities. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985).

---

[5] *See, e.g.,* Kevin C. McMunigal, *Desert, Utility, and Minimum Contacts: Toward a Mixed Theory of Personal Jurisdiction*, 108 Yale L.J. 189, 189 (1998) ("Ambiguity and incoherence have plagued the minimum contacts test for the more than five decades during which it was served as a cornerstone of the Supreme Court's personal jurisdiction doctrine."); Christopher D. Cameron and Kevin R. Johnson, *Death of a Salesman? Forum Shopping and Outcome Determination Under* International Shoe, 28 U.C. Davis L. Rev. 769, 809-15 (1995) (discussing the "mysterious origins" of the minimum contacts test).

Additionally, exercising personal jurisdiction over defendants must always be consonant with traditional notions of fair play and substantial justice. *Int'l Shoe*, 326 U.S. at 316. While these elements afford some shape to the due process inquiry, each is, as we shall see, not without its own interpretative difficulties.

III

The first element can appear in different guises. In the tort context, we often ask whether the nonresident defendant "purposefully directed" its activities at the forum state; in contract cases, meanwhile, we sometimes ask whether the defendant "purposefully availed" itself of the privilege of conducting activities or consummating a transaction in the forum state. *See Bell Helicopter Textron, Inc. v. Heliquest Int'l, Ltd.*, 385 F.3d 1291, 1296 (10th Cir. 2004); *Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1277 (10th Cir. 2005); *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1092 (10th Cir. 1998). In all events, the shared aim of "purposeful direction" doctrine has been said by the Supreme Court to ensure that an out-of-state defendant is not bound to appear to account for merely "random, fortuitous, or attenuated contacts" with the forum state. *Burger King*, 471 U.S. at 475 (internal quotations omitted).

Because this rule of law is more aspirational than self-defining, courts have often retreated to analogizing individual cases to discrete Supreme Court personal jurisdiction precedents. Indeed, this feature of due process personal jurisdiction

litigation has led many commentators to complain of the lack of predictability and certainty in this area of law. *See Int'l Shoe*, 326 U.S. at 322-26 (Black, J. concurring in the judgment) (referring to the majority's approach to jurisdiction as consisting of "elastic standards" and "vague Constitutional criteria"); s*ee also* C. Douglas Floyd and Shima Baradaran-Robinson, *Toward a Unified Test of Personal Jurisdiction in an Era of Widely Diffused Wrongs: The Relevance of Purpose and Effects*, 81 Ind. L. J. 601, 638 (2006). Happily, at least in this case, plaintiffs have fixed their focus on a single precedential analogy that, they argue, controls the outcome of the "purposeful direction" inquiry in this case: the Supreme Court's disposition in *Calder v. Jones*, 465 U.S. 783 (1984). While we do not imagine that *Calder* necessarily describes the only way to satisfy the purposeful direction test, because plaintiffs assert it provides the key to unlocking the courthouse door for them, we are able to limit our attention in this case to *Calder*'s demands.

In *Calder*, Shirley Jones, of Partridge Family fame, brought suit in California against the *National Enquirer*, the *Enquirer*'s local distributor, and the writer and editor of an allegedly libelous article published in the *Enquirer*. *Id.* at 785-86. While the *Enquirer* and its distributor chose not to contest jurisdiction, both the writer, John South, and the editor, Iain Calder, challenged the authority of the California courts to hear Ms. Jones's suit, stressing that the article was

written and edited in Florida and, though the *Enquirer* was distributed nationally, the individual defendants had few contacts with California. *Id*. at 785-86, 789. The Court found specific jurisdiction in California was nonetheless appropriate because the defendants had not engaged in "mere untargeted negligence. Rather, their intentional, and allegedly tortious, actions, were expressly aimed at California." *Id*. at 789. The Court added that "Petitioner South wrote and petitioner Calder edited an article that they *knew* would have a potentially devastating impact upon respondent. And they *knew* that the brunt of that injury would be felt by respondent in the State in which she lives and works [California] . . . ." *Id*. at 789-90. (emphases added).

Distilling *Calder* to its essence, we thus understand the Court to have found purposeful direction there because of the presence of (a) an intentional action (writing, editing, and publishing the article), that was (b) expressly aimed at the forum state (the article was about a California resident and her activities in California; likewise it was drawn from California sources and widely distributed in that state), with (c) knowledge that the brunt of the injury would be felt in the forum state (defendants knew Ms. Jones was in California and her career revolved around the entertainment industry there). At plaintiffs' invitation, we turn our attention to examining the presence or absence of these same factors in their case.

A

1

In *Calder*, the Court emphasized in the first instance that the defendants undertook "intentional, and allegedly tortious, actions . . . ." *Id*. at 789. Plaintiffs argue, and defendants do not dispute, that the sending of the NOCI was an intentional act. However, the parties disagree over whether under *Calder* plaintiffs must also allege that the act itself was wrongful or tortious in some sense, and whether in this case plaintiffs have done so successfully.

In favor of the view that any intentional act, wrongful or not, suffices under *Calder*, plaintiffs point to the Ninth Circuit's decision in *Yahoo! Inc. v. La Ligue Contre Le Racisme Et L'Antisemitisme*, 433 F.3d 1199 (9th Cir. 2006) (*en banc*). In *Yahoo!*, a majority of a Ninth Circuit *en banc* panel effectively overruled that court's earlier holding in *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082 (9th Cir. 2000), and held that "we do not read *Calder* necessarily to require in purposeful direction cases that all (or even any) jurisdictionally relevant effects have been caused by wrongful acts." 433 F.3d at 1208; *see also id*. at 1230 n.2 (O'Scannlain, J. concurring only in the judgment). Such a requirement, the court suggested, would improperly conflate the jurisdictional analysis with the merits. *Id*. at 1208. And indeed, this view has support in *Calder* itself. There, the Court "reject[ed] the suggestion that First Amendment concerns enter into the

jurisdictional analysis" in a situation in which the First Amendment was available as a defense on the merits of Ms. Jones's defamation claim. *Calder*, 465 U.S. at 790.

Defendants, unsurprisingly, disagree (as did the district court), arguing that jurisdiction should be denied because their conduct in terminating plaintiffs' auction – and thereby vindicating their putative intellectual property rights – cannot be fairly described as "wrongful" conduct. On this score, defendants could point to a considerable dissent in *Yahoo!* arguing that in non-contract cases allegations of wrongful behavior are necessary, *see* 433 F.3d at 1228-32 (O'Scannlain, J., concurring only in the judgment),[6] as well as the prior panel decision of the Ninth Circuit in *Bancroft*, 223 F.3d at 1089 (Sneed, J., concurring), and decisions by other circuits holding that under *Calder* the intentional act must be tortious, *see, e.g.*, *Marten v. Godwin*, 499 F.3d 290, 297 (3d Cir. 2007).

As it happens, we are able to avoid entering this thicket. Even if *Calder* can be properly read as requiring some form of "wrongful" intentional conduct, we agree with plaintiffs that their complaint complies. Plaintiffs allege that

---

[6] Yet, as a wrongful or tortious act concededly is not necessary in contract cases, one might (as plaintiffs do) ask why such an act would be required in a declaratory judgment action (like this one) that is not itself premised on a question of tort.

defendants intentionally sent a letter to eBay invoking the VeRO procedures. Compl. ¶¶ 14, 22-23, 33, Ex. 2, 4; Plaintiffs' Response to Motion to Dismiss ¶ 9. They allege that defendants took this action with the intent of terminating plaintiffs' auction – thereby causing them lost business and a damaged business reputation. They further allege that defendants took this action on the basis of an erroneous copyright claim, asserting that the fabric in question was perfectly lawful in light of the fair use doctrine, and that defendants were well aware of this fact. 17 U.S.C. § 107; Compl. ¶ 45 *et seq*. Finally, plaintiffs allege that, in light of the foregoing, defendants' claim that they were innocently seeking to protect their copyright was "simply a smoke-screen attempt to justify unwarranted interference in the lawful sale of an item." Compl. ¶ 60. While conclusory allegations, or a mere "formulaic recitation of the elements of a cause of action," will not suffice to defeat a Fed. R. Civ. P. 12(b) motion, *Twombly*, 127 S. Ct. at 1965, crediting the complaint as true as we must at this stage of the litigation, and further giving it the solicitous construction due a *pro se* filing, *see Van Deelen v. Johnson*, 497 F.3d 1151, 1153 n.1 (10th Cir. 2007),[7] the facts described above are sufficient to permit an inference that defendants tortiously interfered with plaintiffs' business. Plaintiffs' allegations go beyond "labels and conclusions,"

---

[7] The fact that plaintiffs were represented by counsel during this appeal does not affect the solicitous construction we must afford their earlier *pro se* filings. *See Van Deelen*, 497 F.3d at 1153 n.1.

*Twombly*, 127 S. Ct. at 1965, to include facts detailing what defendants did (sending the NOCI), what they knew would happen when they sent the NOCI (the cancellation of plaintiffs' auction and its ramifications for plaintiffs' business), and the basis for that knowledge (the specifics of the VeRO program and defendants' participation in that program).

2

Defendants separately object that plaintiffs seek jurisdiction based not on defendants' intentional actions, as they must, but instead based on plaintiffs' own, unilateral conduct. In this vein, defendants emphasize it was plaintiffs who chose to sell allegedly infringing material through eBay, and they remind us of our legion case law holding that "the unilateral activity of another party 'is not an appropriate consideration when determining whether a defendant has sufficient contacts with a forum State to justify an assertion of jurisdiction.'" *Doe v. Nat'l Med. Servs.*, 974 F.2d 143, 146 (10th Cir. 1992) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 417 (1984)); *see also Melea, Ltd. v. Jawer SA*, ---F.3d---, 2007 WL 4510263 at *4 (10th Cir. 2007).

Unilateral acts, however, occur in at least two analytically distinct ways. First, as in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980), a plaintiff might purchase a product in one forum and carry it into another forum. Absent at least the seller's foreknowledge that the buyer was going to take the

product into a particular forum, the defendant cannot reasonably be said to have purposefully directed its activities at the forum. The defendant's only contact, the presence of its product in the forum, is the result of the act of someone else and not the defendant's own intentional conduct. A second type of unilateral activity appears where the defendant *has* purposefully directed its activities at the forum, but the plaintiff's injury nonetheless "arises out of" the plaintiff's or a third party's unilateral acts, rather than the defendant's. *See, e.g.*, *Kuenzle v. HTM Sport-und Freizeitgeräte AG*, 102 F.3d 453, 456-57 (10th Cir. 1996) (holding that "[r]egardless of any contacts that exist between [the defendant] and the forum," the suit arose from the activities of the plaintiff). We believe this second sort of unilateral act, with something of a supervening causation flavor to it, is more appropriately addressed at the second ("arising out of") stage of the minimum contacts inquiry, and so we defer discussion of it until then. *See infra*, Part IV.

With respect to the first type of unilateral act, we have no difficulty determining that plaintiffs have alleged an intentional and wrongful act by defendants on which jurisdiction may permissibly be founded. Plaintiffs do not argue, and we do not remotely hold, that jurisdiction is proper simply based on plaintiffs' decision to hold an eBay auction of materials that allegedly infringe

upon defendants' copyrights.[8]  Rather, it is essential to our analysis that it was

defendants who in this case took the intentional action of sending a NOCI

specifically designed to terminate plaintiffs' auction, and defendants who

followed that act with an express threat to sue within 10 days in order to prevent

the revival of plaintiffs' auction.

B

*Calder*, of course, required more than an intentional action.  It also stressed

that the defendants' conduct was "expressly aimed at California."  465 U.S. at

789.  In the sentences immediately following its introduction of this concept, the

Court emphasized that California was the "focal point" of the allegedly tortious

story.  *Id.*[9]  To be sure, there is some overlap between this test and *Calder*'s

additional requirement, discussed below (*see infra* Part III.C), that a defendant

---

[8]  In *Marschke v. Wratislaw*, __ N.W.2d__, 2007 WL 4277436 (S.D. 2007), the South Dakota Supreme Court held that exercising personal jurisdiction in South Dakota over a Montana car dealer who had posted a car for sale on eBay that was subsequently bought by the South Dakota plaintiff violated due process. In *Winfield Collection, Ltd. v. McCauley*, 105 F. Supp. 2d 746 (E.D. Mich. 2000), the court held similarly in a case involving a defendant who sold crafts through eBay that used patterns allegedly infringing the plaintiff's copyrights.

[9]  Some courts have held that the "expressly aimed" portion of *Calder* is satisfied when the defendant "individually target[s] a known forum resident." *See Bancroft*, 223 F.3d at 1087.  We have taken a somewhat more restrictive approach, holding that the forum state itself must be the "focal point of the tort." *See Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1080 (10th Cir. 1995) (internal quotations omitted); *see also Remnick v. Manfredy*, 238 F.3d 248, 259-60 (3d Cir. 2001).  Any difference between these standards is immaterial to the resolution of this case, however, as plaintiffs succeed under either.

must know that the "harm . . . was suffered" in the forum state. But the overlap is far from complete, as the "express aiming" test focuses more on a defendant's intentions – where was the "focal point" of its purposive efforts – while the latter requirement concentrates on the consequences of the defendant's actions – where was the alleged harm actually felt by the plaintiff.

Defendants submit that plaintiffs have failed to meet the "expressly aiming" standard, pointing to the uncontested fact that they sent their NOCI invoking eBay's VeRO procedures not to plaintiffs in Colorado but to eBay in California. Such focus on the physical direction of defendants' NOCI, however, does not tell the whole story. It overlooks, for example, the fact that eBay's VeRO procedures allow a NOCI filer to terminate another party's auction automatically, as well as plaintiffs' allegation that defendants intended to halt their auction. Compl. ¶¶ 14, 22-23, 33, Ex. 2, 4; Plaintiffs' Response to Motion to Dismiss ¶ 9. It overlooks, too, the fact that the NOCI at issue in this case itself attests to this alleged intent: the NOCI explicitly requests eBay to "act expeditiously to remove or disable access to the material or items claimed to be infringing." Applt's App. at 40. Defendants' affidavits themselves do not contest, but instead tend to confirm, that they intended to halt plaintiffs' auction. The presidents of both Chalk & Vermilion and SevenArts state that "[t]he NOCI was submitted to protect copyrights in the Erté design, and was not submitted with the knowledge or intent

that eBay would impose any penalty upon Plaintiffs *beyond the sale of the fabric specifically referenced in the NOCI.*"  Applt's App. at 138, 140 (emphasis added). Further, in an e-mail responding to the possibility that the allegedly infringing fabric would be relisted as a result of plaintiffs' counter notice, SevenArts instructed Chalk & Vermilion to "have E Bay remove the item again if that is possible." *Id*. at 43.  And when plaintiffs did not acquiesce, defendants e-mailed plaintiffs directly in Colorado threatening them with suit in federal court to prevent the future sales of the fabric in question.  *Id*. at 44.

Thus, while, as defendants emphasize, the NOCI formally traveled only to California, it can be fairly characterized as an intended means to the further intended end of cancelling plaintiffs' auction in Colorado.  In this way, it is something like a bank shot in basketball.  A player who shoots the ball off of the backboard intends to hit the backboard, but he does so in the service of his further intention of putting the ball into the basket.  Here, defendants intended to send the NOCI to eBay in California, but they did so with the ultimate purpose of cancelling plaintiffs' auction in Colorado.  Their "express aim" thus can be said to have reached into Colorado in much the same way that a basketball player's express aim in shooting off of the backboard is not simply to hit the backboard, but to make a basket.

Our view finds support in *Burger King*, as well as in a pair of cases from a sister circuit. In *Burger King*, the Supreme Court found jurisdiction in Florida appropriate over a Michigan franchisee who breached an agreement with, and infringed the trademark of, a Florida franchisor. Foreshadowing the Internet age, the Court noted that "it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications. . . . So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there." 471 U.S. at 476. Such is the case before us. Defendants' express aim in acting was to halt a Colorado-based sale by a Colorado resident, and neither the lack of defendants' physical presence in Colorado nor the fact that they used a California-based entity to effectuate this purpose diminish this fact.

In *Bancroft*, a case perhaps even more analogous to ours, a small California company that sold computer and networking products and services, Bancroft & Masters, registered the domain name masters.com with Network Solutions Inc. ("NSI"), a company based in Virginia. Augusta National, which operates the Augusta National Golf Club and sponsors the Masters golf tournament, sent a letter from its headquarters in Georgia to NSI in Virginia, asserting that Bancroft & Masters had violated its trademark. Much as under the VeRO procedures at

issue here, Augusta National's complaint had the effect, under NSI policy, of prohibiting Bancroft & Masters from retaining its domain name unless it obtained a declaratory judgment that it was not infringing on Augusta National's marks. Bancroft & Masters brought such a suit in California and our sister circuit held that, because Augusta National's purpose was specifically to target a known California business, it satisfied *Calder*'s "express aiming" test despite the fact that letter was formally sent to Virginia rather than California. 223 F.3d at 1087-88. Precisely the same reasoning applies here.

Informative in its contrast, *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797 (9th Cir. 2004), dealt with a car dealer in Ohio whose local Akron advertisements encouraged potential buyers to "terminate" their current car leases in favor of a new Martin auto. The advertisement featured a photograph of Arnold Schwarzenegger in *The Terminator* (1984), one of his most popular film roles in which he appears as a murderous cyborg, "(a cybernetic organism; i.e., a robot whose mechanical parts are encased in living tissue . . .)." *Id.* at 799. When Mr. Schwarzenegger sought to sue the car dealership in California for the unauthorized use of his likeness, the Ninth Circuit refused jurisdiction, stressing that, unlike the defendants in *Calder*, the car dealership's advertisements were not "expressly aimed" at Mr. Schwarzenegger in the forum state (California). *Id.* at 807. While Mr. Martin perhaps *knew* Mr. Schwarzenegger lived in California,

this was insufficient to convey jurisdiction there because the *intentions* behind his advertisement was solely to entice local market Ohioans, not Californians, "to buy or lease cars from Fred Martin." *Id*. By contrast, defendants in our case *are* alleged to have *intended* their extra-forum conduct to reach and affect plaintiffs' business operations in Colorado.

While defendants do not deny that they sought to terminate plaintiffs' auction, they do deny that they knew plaintiffs' business was located in Colorado, and therefore that their conduct could have been expressly aimed at Colorado. But, while defendants are of course free to pursue that defense in later stages of this litigation, plaintiffs have alleged that defendants knew the location of their business. Plaintiffs' Response to Motion to Dismiss ¶ 10. Neither does this allegation rest on conjecture or supposition, but on well-pled and record facts. *Compare id*. and Compl. *with Twombly*, 127 S. Ct. at 1962-63. Plaintiffs' location is clearly disclosed on their eBay auction page, as is the fact that Colorado residents had to pay sales tax for any purchases from plaintiffs. Applt's App. at 88, 92-94. And for their part, defendants' statements about what they saw are very carefully drafted to avoid disputing that they viewed plaintiffs' eBay auction page – indeed, it was presumably seeing this page that induced defendants to contact eBay about halting plaintiffs' auction.

C

In assessing the question of "purposeful direction," *Calder* stressed the fact that the *Enquirer* defendants "knew that the brunt of th[e] injury would be felt" in the forum state. *Calder*, 465 U.S. at 789-90. Meanwhile, in *Keeton v. Hustler Magazine*, 465 U.S. 770 (1984), issued the same day as *Calder* and also written by then-Justice Rehnquist, the Court found jurisdiction proper in a libel action brought in New Hampshire even though "the bulk of the harm done to petitioner occurred outside" the forum state. *Id*. at 780; *see also Yahoo!*, 433 F.3d at 1207 (discussing this tension). In our case, the question where the brunt or bulk of harm need take place makes little difference, as there is no meaningful dispute that plaintiffs' injury was suffered entirely in the forum state, Colorado. Also, for reasons we have just discussed, *see supra* Part III.B, plaintiffs have satisfied their burden of establishing, at this stage, that defendants knew plaintiffs' business and auction were based in Colorado, and therefore knew the effects of the NOCI would be felt there.

Defendants do, however, contend, just as the unsuccessful defendants in *Calder* did, 465 U.S. at 789, that the "mere foreseeability" that the NOCI would have effects in Colorado is insufficient to support jurisdiction, and that plaintiffs have failed to allege the "something more" than foreseeability required to establish personal jurisdiction, *see, e.g.*, *Asahi Metal Indus. Co., Ltd. v. Superior*

*Court*, 480 U.S. 102, 111 (1987) (O'Connor, J.) (plurality op.); *Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1534 (10th Cir. 1996). We surely agree that under *Calder* the mere foreseeability of causing an injury in the forum state is, standing alone, insufficient to warrant a state exercising its sovereignty over an out-of-state defendant. But under the *Calder* test plaintiffs have invoked, they must establish, and have established for purposes of a motion to dismiss decided on the pleadings and affidavits, not only that defendants foresaw (or knew) that the effects of their conduct would be felt in the forum state, but also that defendants undertook *intentional actions that were expressly aimed at that forum state*. That is, in satisfying *Calder*'s first two prongs, plaintiffs have established that defendants acted with more than foresight (or knowledge) that effects would be felt in Colorado.

Indeed, at the end of the day our case is an easier one than *Calder* itself. There, the defendants intended to write an article, the "focal point" of which was California, for the *Enquirer* to publish and distribute in California. 465 U.S. at 789. Yet, the effects of which the plaintiff complained likely were not bound up in the defendants' intentions. The defendant writer and editor were professionals presumably interested chiefly in the sale of newspapers, not in doing *intentional* harm to Ms. Jones; that is, while they *knew* their article would have adverse effects on her in California, those effects were to them perhaps no more than

- 25 -

foreseeable side-effects. By contrast, defendants here more than foresaw or knew the harm alleged to have befallen forum residents; indeed, they do not dispute that they *intended* to cause the cancellation of plaintiffs' auction, and it is that precise alleged harm that plaintiffs seek to have redressed through this suit. As our sister circuit has said, actions that "are performed for the very purpose of having their consequences felt in the forum state" are more than sufficient to support a finding of purposeful direction under *Calder*. *Finley v. River North Records, Inc.*, 148 F.3d 913, 916 (8th Cir. 1998) (quotation omitted) (holding jurisdiction proper where an out-of-state defendant sent fraudulent material into the forum state with the purpose of inducing plaintiff's reliance, and such reliance was the harmful effect for which plaintiff sought redress).

IV

Having determined that defendants "purposefully directed" their activities at the forum state, due process requires us next to ask whether plaintiffs' injuries "arise out of" defendants' contacts with the forum jurisdiction. Many courts have interpreted this language to require some sort of causal connection between a defendant's contacts and the suit at issue. Of course, as Prosser and Keeton have noted, "[t]here is perhaps nothing in the entire field of law which has called forth more disagreement, or upon which the opinions are in such a welter of confusion," as causation doctrine, *Prosser and Keeton on the Law of Torts* 263

(5th ed., 1984), and this arena is no exception.  Some courts have interpreted the

phrase "arise out of" as endorsing a theory of "but-for" causation, *see, e.g.*,

*Mattel, Inc. v. Greiner and Hausser GmbH.*, 354 F.3d 857, 864 (9th Cir. 2003),

while other courts have required proximate cause to support the exercise of

specific jurisdiction, *see, e.g., Mass. Sch. of Law at Andover, Inc. v. Am. Bar

Ass'n*, 142 F.3d 26, 35 (1st Cir. 1998).  Under the former approach, any event in

the causal chain leading to the plaintiff's injury is sufficiently related to the claim

to support the exercise of specific jurisdiction.  The latter approach, by contrast,

is considerably more restrictive and calls for courts to "examine[s] whether any of

the defendant's contacts with the forum are relevant to the merits of the plaintiff's

claim."  *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 319 (3d Cir. 2007).

Yet a third approach, departing somewhat from these causation-based principles,

instead asks whether there is a "substantial connection" or "discernible

relationship" between the contacts and the suit.  *See id.* at 319-20 (collecting

cases).  Under this theory, the relationship between the contacts and the suit can

be weaker when the contacts themselves are more extensive.  *See Shoppers Food

Warehouse v. Moreno*, 746 A.2d 320, 335-36 (D.C. 2000).

The parties point us to no case in which we have had occasion to announce

a test as to when a contact is sufficiently related to a claim to support the exercise

of jurisdiction, but we agree with our sister circuit that the "substantial

connection" test inappropriately blurs the distinction between specific and general personal jurisdiction. *See Sandy Lane Hotel Co.*, 496 F.3d at 321. General jurisdiction is based on an out-of-state defendant's "continuous and systematic" contacts with the forum state, *Trujillo*, 465 F.3d at 1218 n.7 (quoting *Helicopteros*, 466 U.S. 408), and does not require that the claim be related to those contacts. Specific jurisdiction, on the other hand, is premised on something of a *quid pro quo*: in exchange for "benefitting" from some purposive conduct directed at the forum state, a party is deemed to consent to the exercise of jurisdiction for claims related to those contacts. A relatedness inquiry that varies the required connection between the contacts and the claims asserted based on the number of the contacts improperly conflates these two analytically distinct approaches to jurisdiction. By eliminating the distinction between contacts that are sufficient to support any suit and those that require the suit be related to the contact, it also undermines the rationale for the relatedness inquiry: to allow a defendant to anticipate his jurisdictional exposure based on his own actions. *See* Linda Sandstrom Simard, *Meeting Expectations: Two Profiles For Specific Jurisdiction*, 38 Ind. L. Rev. 343, 366 (2005).

As between the remaining but-for and proximate causation tests, we have no need to pick sides today. On the facts of this case, we are satisfied that either theory adopted by our sister circuits would support a determination that plaintiffs'

cause of action arises from the defendants' contact with Colorado. That defendants' contact with Colorado, the sending of the NOCI to eBay and the ensuing e-mail exchange in which defendants threatened plaintiffs with suit, is a but-for cause of this action is clear. After all, if defendants had not claimed that plaintiffs were infringing their copyright, plaintiffs would have had no reason to seek a declaratory judgment that their actions did not run afoul of defendants' rights. The NOCI was also the cause in fact of the real world harm that plaintiffs seek to have remedied: the cancellation of their auction and the black mark on their eBay record. In the absence of the NOCI, plaintiffs would not have had to contend with either of those effects, and thus would have had no reason to attempt to hale defendants into court.

We believe that the NOCI can also fairly be considered the proximate cause of plaintiffs' claim. In the NOCI, defendants swore under penalty of perjury that they had a good faith belief that plaintiffs' auction infringed their rights. The merits of plaintiffs' declaratory judgment action addresses the exact same question, and their claim for injunctive relief seeks to prevent future interference with plaintiffs' business, interference which defendants have threatened. More specifically, plaintiffs argue that defendants' infringement claim contained in the NOCI is incorrect, and that therefore their auction was improperly cancelled and

their sales record erroneously smeared. The NOCI is thus at the very core of plaintiffs' suit.

Defendants' chief argument against finding plaintiffs' suit sufficiently related to the NOCI is (once again) that plaintiffs' suit is based on plaintiffs' unilateral conduct. Even if the NOCI was purposefully directed at Colorado, defendants argue that because plaintiffs are seeking a judgment that their own actions are legal, their claim does not arise out of any activity of defendants. This argument, however, neglects the fact that plaintiffs filed suit in direct response to defendants' suppression of their auction and threat to bring a suit in less than two weeks. While plaintiffs' actions are admittedly also a but-for cause of this suit, that does not change the fact that what plaintiffs seek is relief from defendants' actions and the ensuing consequences following directly from those actions.

Our case is, in this respect, akin to *Red Wing Shoe Co. v. Hockerson-Halberstadt, Inc.*, 148 F.3d 1355, 1360 (Fed. Cir. 1998), and *CompuServe v. Patterson*, 89 F.3d 1257 (6th Cir. 1996). In *Red Wing Shoe*, the Federal Circuit held the threat of an infringement suit carried by a cease-and-desist letter acts as a restraint on the free flow of goods, and a declaratory judgment action by the purveyor of allegedly non-infringing goods arises from (and is an attempt to

eliminate) that restraint. 148 F.3d at 1360.[10] Neither is the restraint here based

on threats alone, although defendants did indeed threaten litigation; rather,

defendants affirmatively interfered with plaintiffs' business, and this suit arises

directly from that interference. *See also Silent Drive, Inc. v. Strong Industries,*

*Inc.*, 326 F.3d 1194, 1202 (Fed. Cir. 2003).

Similarly, in *CompuServe*, a Texas defendant had threatened to sue an Ohio

corporation for trademark infringement if it did not pay him $100,000 to settle his

claim. The Ohio corporation thereafter filed a preemptive declaratory judgment

suit in Ohio. After holding that the defendant's threat constituted a contact with

Ohio, the court applied a proximate cause standard to determine whether the

plaintiff's claim arose from that contact. 89 F.3d at 1267. The court noted that

there, as here, the defendant's actions threatened harm to the economic livelihood

of the plaintiff, and it was that threat the plaintiff sought to eliminate through its

suit. *Id.* Indeed, the instant case is an even clearer case for jurisdiction than

*CompuServe* because Ms. Dudnikov and Mr. Meadors seek relief not merely from

---

[10] To be sure, *Red Wing Shoe* ultimately held that jurisdiction was inappropriate on the reasonableness prong of our due process analysis because of policy concerns unique to the intellectual property context, a question we take up in Part V, *infra*. But for purposes of the relatedness prong of our analysis, plaintiffs' suit attacks the very type of restraint that *Red Wing Shoe* held gives rise to a suit seeking a declaration of non-infringement.

threats, but from actual restraints on their business resulting from defendants'

NOCI.

V

Having determined that plaintiffs met their burden, at this stage of the

litigation, of establishing "minimum contacts" – that defendants' conduct was

"purposefully directed" at Colorado and that this lawsuit arose out of defendants'

contacts with Colorado – we must still inquire whether the exercise of personal

jurisdiction would "offend traditional notions of fair play and substantial justice."

*Int'l Shoe*, 326 U.S. at 316 (internal quotation omitted).  In doing so, we are

cognizant of the fact that, with minimum contacts established, it is incumbent on

defendants to "present a compelling case that the presence of some other

considerations would render jurisdiction unreasonable."  *Pro Axess*, 428 F.3d at

1280 (internal quotation omitted).

In making such an inquiry courts traditionally consider factors such as

these:

> (1) the burden on the defendant, (2) the forum state's interests in resolving
> the dispute, (3) the plaintiff's interest in receiving convenient and effectual
> relief, (4) the interstate judicial system's interest in obtaining the most
> efficient resolution of controversies, and (5) the shared interest of the
> several states [or foreign nations] in furthering fundamental social policies.

*OMI*, 149 F.3d at 1095; *see also TH Agric. & Nutrition, LLC v. Ace European*

*Group Ltd.*, 488 F.3d 1282, 1292 (10th Cir. 2007).  *But see* International Shoe

*and the Legacy of Legal Realism*, 2001 Sup. Ct. Rev. 347, 368 (2001) (arguing that considering factors such as these "imposes all of the costs of case-by-case adjudication without conferring any benefits in the form of predictable outcomes").

None of these factors, separately or in combination, seems to weigh definitively in favor of defendants. With respect to the burden on them associated with litigating in Colorado, defendants' threat to litigate in federal court indicates a willingness to litigate in some federal court in the United States. As far as we can tell, there are a finite number of possible fora in this country in which this case might be litigated, including perhaps Connecticut or Delaware, Chalk & Vermilion's home state and state of incorporation; Colorado, the plaintiffs' home state; or California, eBay's home state.

California has virtually nothing to do with this litigation: eBay is not a party to this suit, we have been pointed to no specific witnesses or evidence located in California, and the merits of this dispute are wholly unrelated to California substantive law. Thus, we are left to consider the burden on the parties of litigating this suit in Colorado rather than, say, Connecticut or Delaware. As in any case in which the parties reside in different fora, one side must bear the inconvenience of litigating "on the road." While admittedly a burden, defendants have not indicated that their defense of this case would be hindered by the

territorial limits on the Colorado district court's power to subpoena relevant witnesses, or indeed hampered in any other significant way.

To be sure, on the other side of the coin, while "[s]tates have an important interest in providing a forum in which their residents can seek redress for injuries caused by out-of-state actors," *OMI*, 149 F.3d at 1096, and while they surely consider federal district court in Colorado a convenient and effective forum, plaintiffs have suggested no reason to think that federal courts in Connecticut or Delaware, for example, would be unable to adjudicate their claims under federal law with equal fairness and effectiveness. *Cf. id.* at 1097 (noting that plaintiff's interest in convenient and effective relief "may weigh heavily in cases where a Plaintiff's chances of recovery will be greatly diminished by forcing him to litigate in another forum because of that forum's laws or because the burden may be so overwhelming as to practically foreclose pursuit of the lawsuit").

The only traditional factor that does loom large for either side in this case is the potential policy interests of a foreign nation. *See Pro Axess, Inc.*, 428 F.3d at 1281 (considering this interest under the fifth factor concerning the substantive social policy interests of states or nations). While Chalk & Vermilion is based in Connecticut, SevenArts is a British corporation, and thus we would be remiss if we did not consider whether British substantive social policies are implicated by an exercise of jurisdiction over SevenArts. In this particular case, however, we

have little trouble concluding that they are not. Nowhere have defendants disputed that this case will be decided solely under federal copyright law, and indeed, the NOCI itself states that it is defendants' rights under "state, federal, or United States law," not British law, that are being infringed. Applt's App. at 40. SevenArts has been exposed to jurisdiction in the United States by the actions of its American agent, actions of which, the record is clear, SevenArts not only approved but appears to have directed. *See id.* at 36 ("Please have E Bay remove the item again . . ."); *id.* at 28 ("The fabric is a violation of our rights and we insist on its withdrawal whenever it appears on E Bay."). Furthermore, in its correspondence with Ms. Dudnikov, SevenArts itself threatened to file suit in federal court in the United States to block plaintiffs' counter notice from taking effect. *Id.* at 44. Given these facts, there would seem to be no substantive British interest in this litigation to be protected, and, apart from pointing to SevenArts' British citizenship, defendants themselves identify none.

Defendants do submit, however, that an entirely different sort of policy interest does weigh strongly in their favor – namely, the federal interest in allowing federal copyright holders to alert potential infringers of their rights and encouraging the settlement of such potential disputes. By way of support, they point us to *Red Wing Shoe*. There, a Louisiana corporation sent a letter to a Minnesota corporation informing the latter that the former believed a shoe

manufactured by the Minnesota corporation infringed the Louisiana corporation's patent, and offering to negotiate for a non-exclusive license. The Federal Circuit held that this "cease-and-desist" letter constituted a contact purposefully directed at Minnesota, and that the case arose out of that contact. *See supra* Part IV. Yet, the court held that a patent holder would not "subject itself to personal jurisdiction in a forum *solely by informing* a party who happens to be located there of suspected infringement." *Red Wing Shoe*, 148 F.3d at 1361 (emphasis added). The court reasoned that such cease-and-desist letters are essential to promoting settlement of copyright disputes, and the promotion of settlement is a strong federal policy interest. *Id.*; *see also Silent Drive*, 326 F.3d at 1206; *Wise v. Lindamood*, 89 F. Supp. 2d 1187 (D. Colo. 1999).

Assuming without deciding that it would be unreasonable to found jurisdiction solely on a cease-and-desist letter, this case is readily distinguishable. Defendants' NOCI went well beyond providing notice to plaintiffs of the claimed infringement and seeking settlement; it purposefully caused the cancellation of their auction and allegedly threatened their future access to eBay and the viability of their business. Compl. ¶¶ 15, 30. Of course, plaintiffs' contact information was readily accessible from their eBay auction site and defendants thus had the option of sending a mere cease-and-desist letter directly to plaintiffs. Instead, however, they communicated their complaint to a third party with the intent that

the third party take action directly against plaintiffs' business interests, something that thereafter occurred. On these facts, we cannot say that the exercise of jurisdiction would be either unfair or unjust, and again our inquiry profits by analogy to *Bancroft*. The court there held that cases involving cease-and-desist letters were inapposite because the plaintiff's case arose "principally out of [the defendant]'s letter to [the third party], and that letter did more than warn or threaten [the plaintiff]." 223 F.3d at 1089. Instead, the letter initiated procedures under which the plaintiff either had to give in to the defendant's demands (thereby losing use of its domain name), or take legal action. *See supra* Part III.B. Such is the situation with which we are faced. Defendants did not merely inform plaintiffs of their rights and invite settlement discussions prior to potential litigation, but took affirmative steps with third parties that suspended plaintiffs' ongoing business operations. And under eBay's procedures, plaintiffs' only recourse, other than capitulation, was litigation. In such circumstances, we cannot say that requiring defendants to answer for their actions in Colorado is unfair.

* * *

Defendants sent a NOCI to eBay expressly intending (and effectually acting) to suspend plaintiffs' auction in Colorado. Plaintiffs' suit arises from, and is indeed an effort to reverse, the intended consequences of defendants' NOCI

which they incurred in Colorado. For purposes of this motion, moreover, we must assume defendants knew plaintiffs' business was located in Colorado. And defendants point us to no basis in traditional notions of fair play or substantial justice that would preclude suit in that forum. Accordingly, the judgment of the district court is reversed, and this case is remanded for further proceedings not inconsistent with this opinion.

*So ordered.*