RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0132p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

POWER INVESTMENTS, LLC,

*Plaintiff-Appellant*,

*v.*

No. 18-6098

SL EC, LLC; MICHAEL F. BECKER,

*Defendants-Appellees*.

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:18-cv-00466—Danny C. Reeves, District Judge.

Decided and Filed:  June 20, 2019

Before:  SUTTON, BUSH, and LARSEN, Circuit Judges.

_____

**COUNSEL**

**ON BRIEF:**  Carl D. Edwards, Jr., Andrew R. Smith, MILLER EDWARDS RAMBICURE PLLC, Lexington, Kentucky, for Appellant.  William H. Mooney, LYNCH, COX, GILMAN & GOODMAN, PSC, Louisville, Kentucky, for Appellees.

_____

**OPINION**

_____

SUTTON, Circuit Judge.  A Missouri corporation financed part of its purchase of property through a Nevada investment company.  Before long, the investment company ended up with the property, discovering some problems with the deal along the way.  It filed this lawsuit in Kentucky court against the Missouri defendants, which removed the case to federal court.  The district judge dismissed the case for lack of personal jurisdiction over the Missouri defendants. We reverse.

Michael Becker, a Missouri citizen, wanted to buy the Ashley Power Plant in St. Louis. Built to power the World's Fair, the plant has generated steam heat and electricity on the banks of the Mississippi since 1904. Becker (through a Missouri corporation, SL EC, LLC) secured financing from Power Investments, which is incorporated in Nevada and has one member, Mason Miller, who lives in Lexington, Kentucky, and practices law there. Through Miller, Power Investments loaned SL EC about $300,000 in 2016 and 2017 to cover rising costs as Becker prepared to purchase the power plant. Miller also arranged for a private equity fund to loan SL EC the purchase price of the plant. Over the course of these negotiations, Becker called, texted, and emailed Miller many times, seeking funds and making many allegedly false assurances.

Eventually, Becker (through another Missouri entity, Ashley Energy) signed a purchase agreement for the plant. The sale fell apart at closing. Power Investments agreed to buy out Becker's controlling interest in Ashley Energy, assuming the obligation to follow through on the power-plant deal. Power Investments thus now owns the plant.

Miller came to believe that Becker had been less than honest about his use of the loaned funds as well as Ashley Energy's liabilities and the plant's operating costs. Power Investments and Becker proceeded to a duel, using lawsuits as their weapons of choice. Miller filed the first lawsuit in state court in Kentucky based on fraudulent misrepresentation and unjust enrichment. Becker filed the second lawsuit in state court in Missouri based on breach of contract and fraudulent conveyance. Becker removed the Kentucky case to federal court on the basis of diversity jurisdiction, then moved to dismiss it for lack of personal jurisdiction. (Miller by the way successfully removed the Missouri case to federal court in Missouri.) The district court granted Becker's motion to dismiss the case. Power Investments appealed.

To exercise jurisdiction over an out-of-state individual, a federal court must satisfy the long-arm law of the State and federal due process. *Miller v. AXA Winterthur Ins. Co.*, 694 F.3d 675, 679 (6th Cir. 2012). All agree that Miller's lawsuit satisfies the Kentucky long-arm statute because Becker directed his allegedly fraudulent emails and phone calls to Miller and so "transact[ed] . . . business" and made "a telephone solicitation" within the meaning of Kentucky law. Ky. Rev. Stat. § 454.210(2)(a)(1), (9). That leaves due process.

The Due Process Clause of the Fourteenth Amendment limits a State's power to bind an out-of-state defendant to a judgment of its courts. *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291 (1980). Only if the out-of-state defendant has "minimum contacts" with the State sufficient to accord with "traditional notions of fair play and substantial justice" may the state court exercise power over it. *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)).

On top of that, a State may invoke two types of personal jurisdiction against a defendant. One is "general" and turns on the defendant's generic connections to the State—say that it resides there or regularly does business there—connections that need not have any relationship to the allegations in the complaint. *See Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014). The other is "specific" and turns on the defendant's case-related contacts to the jurisdiction. *See Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985). The parties and the district court agree that this case turns on specific jurisdiction. So do we.

Specific jurisdiction requires us to focus on the "affiliation between the forum and the underlying controversy." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quotation omitted). The foreign defendant's "suit-related conduct" must establish "a substantial connection with the forum State." *Walden v. Fiore*, 571 U.S. 277, 284 (2014). The plaintiff must show that the defendant "purposefully avail[ed] himself of the privilege of acting in the forum state." *Miller*, 694 F.3d at 680 (quotation omitted).

While this rule can be "more aspirational than self-defining" in practice, *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1071 (10th Cir. 2008) (Gorsuch, J.), we have a few guideposts. A foreign defendant's relationship with an in-forum plaintiff does not suffice "standing alone" to confer jurisdiction. *Walden*, 571 U.S. at 286. The defendant needs its "own affiliation" with the State. *Id.* A single deal with an in-forum resident also does not by itself suffice. *Burger King*, 471 U.S. at 478. But a contract that bears a "*substantial* connection" to the forum, such as one designed to exploit the forum's market, *Walden*, 571 U.S. at 284–85 (emphasis added), or a "20-year relationship that envisioned continuing and wide-reaching contacts with [the plaintiff] in [the forum]," makes the cut, *Burger King*, 471 U.S. at 479–80; *see*

*Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F.3d 883, 891–92 (6th Cir. 2002) (distinguishing a "one-time, unlikely-to-be-repeated" deal from yearly contracts with forum residents).

Because the concrete often illuminates the abstract, it may help to describe two bookend cases in this area. In *Calder v. Jones*, a California actress sued a Florida reporter, as well as his Florida-based editor and newspaper, in California, claiming an article libeled her. 465 U.S. 783, 784–86 (1984). The Supreme Court found personal jurisdiction. While the Florida defendants worked out of State, "their intentional, and allegedly tortious, actions were expressly aimed at California." *Id.* at 789. The article was about "the California activities of a California resident" and relied on California sources. *Id.* at 788. The Florida-based newspaper, which published the article, had a large national readership and sold hundreds of thousands of copies in California. *Id.* at 785–87. The actress's reputational damage thus occurred there, the "center[]" of her career and home to the newspaper's "largest circulation." *Id.* at 788–90. "In sum," the Court said, "California is the focal point both of the story and of the harm suffered." *Id.* at 789.

Thirty years later in *Walden v. Fiore*, Nevada citizens sued a Georgia law enforcement officer in Nevada, claiming he violated their rights by seizing a large amount of currency they attempted to carry through the Atlanta airport. 571 U.S. at 279–81. The Supreme Court found no personal jurisdiction. The officer acted in Georgia and did not have "anything to do with Nevada." *Id.* at 289. He "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada." *Id.* He simply knew of the *travelers'* ties to that State, and they felt their financial loss there. *Id.* at 289–90. The Court contrasted these facts with *Calder*, where "the nature of the libel tort" and its essential element of publication meant that the injury to the plaintiff's reputation in California "connected the defendants' conduct to *California*, not just to a plaintiff who lived there." *Id.* at 287–88. That, "combined with the various facts that gave the article a California focus," justified personal jurisdiction and distinguished it from *Walden*. *Id.*

This case looks more like *Calder* than *Walden*.

Sharpening our vision is a third case, one similar to this dispute and no less importantly one of our own. *Neal v. Janssen* involved a Tennessee couple who hired a Belgian agent to sell their out-of-state property for them. 270 F.3d 328, 330 (6th Cir. 2001). In a series of phone calls to Tennessee, the agent lied about the size of an offer he fielded—underreporting it and convincing his principals to accept it despite their disappointment—then pocketed a generous portion of the proceeds. The couple sued him for fraud in Tennessee, and we held that due process permitted the Volunteer State's exercise of personal jurisdiction over the defendant. We concluded that the defendant's intentional, fraudulent communications into Tennessee were not "merely incidental" but at the core of the lawsuit. *Id.* at 332; *see Trois v. Apple Tree Auction Ctr., Inc.*, 882 F.3d 485, 491–92 (5th Cir. 2018). The *Neal* defendant "expressly aimed" tortious acts at the forum, *Calder*, 465 U.S. at 789, as opposed to taking actions that did not have "anything to do with" the forum, *Walden*, 571 U.S. at 289.

So also here. Becker initiated the ill-starred relationship with Miller, a Kentucky resident. He communicated with him extensively for well over a year, wheedling several advances, gathering third-party financing, and eventually obtaining a bailout of the power-plant purchase. These fraudulent communications far exceed the handful of phone calls at issue in *Neal*. Becker called Miller's central-Kentucky cell phone number, as well as his landline at a Lexington law firm, "on hundreds of occasions." R. 8-1 at 2. Becker texted Miller "hundreds, if not thousands," of times. *Id.* He sent about 300 emails to Miller's law firm address. And Becker's alleged misrepresentations in these communications constitute the core of Miller's fraud claims—just as in *Neal*.

Yes, Becker never entered Kentucky. But the same was true in *Neal*, as that defendant never entered Tennessee. The reality that modern business often occurs electronically and by phone will not defeat personal jurisdiction, the Supreme Court has said, if the defendant's "efforts are purposefully directed toward residents of another State." *Burger King*, 471 U.S. at 476 (quotation omitted). All in all, Becker "purposefully avail[ed] himself of the privilege of acting in [Kentucky] or causing a consequence" there. *Miller*, 694 F.3d at 680 (quotation omitted).

Power Investments also satisfies the other requirements for personal jurisdiction. The cause of action arises directly from Becker's communications into Kentucky, and it is reasonable to hold him to account in the State where his fraud occurred and from which he benefited financially. *Id.*; *see Neal*, 270 F.3d at 333.

Becker, notably, does not deny that *Neal* bears on the inquiry.

And *Rice v. Karsch*, 154 F. App'x 454 (6th Cir. 2005), does not help him get out of that rut. As we pointed out in distinguishing the case from *Neal*, the out-of-state defendant in *Rice* did not initiate the allegedly fraudulent communications. He made them in response to the plaintiff. *Id.* at 462, 464. That makes the case one in which the "unilateral activity of a *plaintiff*" did not suffice to create personal jurisdiction. *Walden*, 571 U.S. at 286 (emphasis added) (quotation omitted). Today's case is just the other way around.

We reverse.