**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**July 12, 2012**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JACK J. GRYNBERG, an individual;
COTUNDO MINERALES S.A., an
Ecuadorian company; RSM
PRODUCTION CORPORATION, a
Texas corporation; ARCHIDONA
MINERALES, S.A., a Panama
corporation,

        Plaintiffs-Appellants,

v.

IVANHOE ENERGY, INC.;
IVANHOE ENERGY LATIN
AMERICA INC.; IVANHOE
ENERGY ECUADOR INC.;
ROBERT M. FRIEDLAND, an
individual; DAVID R. MARTIN, an
individual,

        Defendants-Appellees.

No. 10-1361
(D.C. No. 1:08-CV-02528-WDM-BNB)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **EBEL**, and **HOLMES**, Circuit Judges.

---

    [*]    This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Federal Rule of Appellate Procedure 32.1 and Tenth Circuit Rule 32.1.

Plaintiffs–Appellants challenge the district court's denial of jurisdictional discovery, refusal to transfer this action, and dismissal for lack of personal jurisdiction. Exercising jurisdiction under 28 U.S.C. § 1291, we **affirm**.

## I. Factual Background

In 2006, the Republic of Ecuador granted Cotundo Minerales S.A. ("Cotundo") seventeen mining concessions. Cotundo is an Ecuadorian company, owned by RSM Production Corporation ("RSM"), a Texas corporation, and Archidona Minerales, S.A. ("Archidona"), a Panamanian corporation. Jack J. Grynberg is the President of RSM. These three businesses—Cotundo, RSM, and Archidona—and Mr. Grynberg are the plaintiffs-appellants in this litigation.

The mining concessions granted to Cotundo gave the company the exclusive right to explore and produce oil from nearly 200,000 acres in the Pungarayacu Heavy Tar Sands Oil Deposit ("Pungarayacu") for thirty years. Although previous estimates suggested that seven billion barrels of oil could be extracted from the Pungarayacu, Mr. Grynberg estimated that at least fifteen billion barrels could be recovered.

Mr. Grynberg contacted David R. Martin, executive co-chairman of Ivanhoe Energy, Inc. ("Ivanhoe"), regarding the Pungarayacu. Mr. Martin shared Ivanhoe's chairman role with Robert M. Friedland, who also served as Ivanhoe's CEO. Mr. Martin also was executive chairman of Ivanhoe Energy Latin America

-2-

Inc. ("IELA") and Ivanhoe Energy Ecuador, Inc. ("IEE"). Messrs. Martin and Friedland and the Ivanhoe-related businesses—Ivanhoe, IELA, and IEE—are the defendants-appellees in this litigation.

Based upon Mr. Grynberg's contact, Mr. Martin requested information from him about the Pungarayacu, and Mr. Grynberg mailed to Mr. Martin a proprietary and confidential report that included Mr. Grynberg's estimates of the oil deposits in the Pungarayacu. Mr. Martin, in turn, sent materials discussing Ivanhoe's oil-processing technology to Mr. Grynberg.

Subsequently, Mr. Martin told Mr. Grynberg that Ivanhoe would be interested in forming a joint venture with Cotundo, and the parties agreed on twenty percent participation by Ivanhoe if the deal moved forward. When Mr. Grynberg encountered resistance to his efforts to visit Ivanhoe's plant in California, he began to sense that the deal would not go forward. He then requested that Mr. Martin return the confidential material. Ultimately, the joint venture was not consummated.

In March 2008, the plaintiffs learned that the defendants traveled to Ecuador to discuss the Pungarayacu, and that Ecuadorian officials made two visits to Ivanhoe's plant in California. In April 2008, Ecuador declared as expired without compensation all mining concessions (1) that were in the exploration phase and that, as of the end of December 2007, had not been the subject of development-related investments; (2) as to which no environmental impact study

had been presented; and (3) with regard to which the consultation process had not been completed. In October 2008, Ivanhoe announced that IEE signed a contract to develop the Pungarayacu. Later in October 2008, a journal article reported Mr. Friedland's estimate that the Pungarayacu contained between fifteen and twenty billion barrels of oil, an estimate allegedly taken from the plaintiffs' confidential materials.

The plaintiffs allege that the defendants stole their "confidential information under false pretenses, made knowing false representations regarding their use of [this] information, and improperly interfered with Plaintiffs' property interests." Aplt. Opening Br. at 7–8. Moreover, the plaintiffs suggest that the defendants may have persuaded Ecuador to revoke their concessions and award them to the defendants "by making unlawful payments and providing valuable gifts to Ecuador government personnel." *Id.* at 7.

## II. Procedural History

On November 20, 2008, Mr. Grynberg, Cotundo, RSM, and Archidona initiated this action by filing a complaint in the United States District Court for the District of Colorado. As amended, the plaintiffs' complaint asserts claims of fraud, intentional and tortious interference with prospective unique business advantages, unjust enrichment, civil conspiracy to commit fraud, and violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") against Ivanhoe, IELA, IEE, Mr. Friedland, Mr. Martin, and ten John Does.

-4-

In January 2009, the defendants moved to dismiss this action for lack of personal jurisdiction. At a scheduling conference held February 10, 2009, the magistrate judge stayed discovery. On March 16, 2009, the plaintiffs moved to lift the stay and obtain jurisdictional discovery. The magistrate judge denied the plaintiffs' motion at an April 3, 2009, hearing. The plaintiffs filed objections to the magistrate judge's ruling on April 13, 2009.

On May 1, 2009, the plaintiffs moved, in the alternative, to transfer this action to the United States District Court for the Eastern District of California. On September 30, 2009, the district court denied the plaintiffs' objections to the magistrate judge's denial of jurisdictional discovery, denied the plaintiffs' motion in the alternative to transfer this action, and dismissed this action without prejudice for lack of personal jurisdiction. *See Grynberg v. Ivanhoe Energy, Inc.*, 666 F. Supp. 2d 1218, 1241–42 (D. Colo. 2009).

The plaintiffs moved for reconsideration of the district court's denial of jurisdictional discovery on October 16, 2009. The district court denied reconsideration on July 15, 2010. *See Grynberg v. Ivanhoe Energy, Inc.*, No. 08-cv-2528, 2010 WL 2802649, at \*1 (D. Colo. July 15, 2010).

This appeal followed.

### III. Discussion

The plaintiffs claim on appeal that the district court erred in (1) finding that it lacked personal jurisdiction over the defendants; (2) denying their motion for

-5-

reconsideration; (3) denying their request for jurisdictional discovery; and (4) denying their motion to transfer the case to the Eastern District of California. We reject their contentions on each ground.

## A.  Personal Jurisdiction

"We review a trial court's dismissal for lack of personal jurisdiction over the defendant *de novo*. The plaintiff has the burden of proving that the court has jurisdiction." *Melea, Ltd. v. Jawer SA*, 511 F.3d 1060, 1065 (10th Cir. 2007) (citation omitted); *see ClearOne Commc'ns, Inc. v. Bowers*, 651 F.3d 1200, 1214 (10th Cir. 2011); *cf. Marcus Food Co. v. DiPanfilo*, 671 F.3d 1159, 1166 (10th Cir. 2011) ("We apply the de novo standard of review to the exercise of personal jurisdiction over a foreign defendant."). "Where, as here, the district court does not hold an evidentiary hearing before dismissing the case, the plaintiff must only make a prima facie showing of personal jurisdiction . . . 'by demonstrating, via affidavit or other written materials, facts that if true would support jurisdiction over the defendant.'" *Melea*, 511 F.3d at 1065 (quoting *TH Agric. & Nutrition, LLC v. Ace European Grp. Ltd.*, 488 F.3d 1282, 1286 (10th Cir. 2007)). "We accept as true any allegations in the complaint not contradicted by the defendant's affidavits, and resolve any factual disputes in the plaintiff's favor."[1] *Id.*

---

[1]  At oral argument, we questioned whether the First Amended Verified Complaint and Demand for Jury Trial was properly verified, and whether the plaintiffs could rely on its allegations to refute the defendants' affidavits. *See*

(continued...)

-6-

"To obtain personal jurisdiction over a nonresident defendant in a diversity action, a plaintiff must show that jurisdiction is legitimate under the laws of the forum state *and* that the exercise of jurisdiction does not offend the due process clause of the Fourteenth Amendment."[2] *Far W. Capital, Inc. v. Towne*, 46 F.3d 1071, 1074 (10th Cir. 1995); *see Shrader v. Biddinger*, 633 F.3d 1235, 1239 (10th Cir. 2011). Thus, we engage in a "two-step analysis" in which "[w]e must initially determine whether the exercise of jurisdiction is sanctioned by the Colorado long-arm statute, which is a question of state law, and then determine whether the exercise of jurisdiction comports with the due process requirements of the Constitution." *Wenz v. Memery Crystal*, 55 F.3d 1503, 1506–07 (10th Cir. 1995) (citation omitted).

---

[1]  (...continued)
Oral Argument at 2:20–2:49. We need not resolve these questions here. First, the plaintiffs disavowed reliance on the verified complaint at oral argument. *See id.* at 2:49–2:58. Second, the allegation at issue—concerning whether Mr. Martin sent materials discussing Ivanhoe's oil-processing technology to Mr. Grynberg—was contained not only in the plaintiffs' complaint, but also in Mr. Grynberg's affidavit. *Compare* Aplt. App. at 345 (First Am. Verified Compl. & Demand for Jury Trial, filed Feb. 9, 2009) ("30. In August of 2006, David Martin sent a study of the process and its advantages to Jack Grynberg . . . ."), *with id.* at 157 (Aff. of Jack J. Grynberg in Supp. of Pls.' Resp. to Mot. to Dismiss for Lack of Personal Jurisdiction, dated Feb. 3, 2009) ("Our discussions went as described in the sworn Complaint, paragraphs[ 25–31].").

[2]  The plaintiffs concede that, "[i]n the proceedings below, all parties and the court restricted their inquiry to whether jurisdiction was proper under Colorado law and the Fourteenth Amendment." Aplt. Opening Br. at 14 n.6. Accordingly, we do not consider whether the federal RICO statute confers personal jurisdiction by authorizing service of process on the defendants.

### 1.     Colorado Long-Arm Statutory Jurisdiction

Both this court and the Colorado Supreme Court have held that the Colorado long-arm statute extends jurisdiction to the greatest extent permitted by due process, obviating the need for a statutory long-arm analysis independent of the due process inquiry. *See AST Sports Sci., Inc. v. CLF Distrib. Ltd.*, 514 F.3d 1054, 1057 (10th Cir. 2008) ("The Colorado Supreme Court has interpreted Colorado's long-arm statute to extend jurisdiction to the fullest extent permitted by the Due Process Clause of the Fourteenth Amendment.  'This interpretation obviates the need for a long-arm statutory analysis separate from the due process inquiry . . . .'" (brackets omitted) (citation omitted) (quoting *Keefe v. Kirschenbaum & Kirschenbaum, P.C.*, 40 P.3d 1267, 1270 (Colo. 2002))); *Dwyer v. Dist. Ct., Sixth Judicial Dist.*, 532 P.2d 725, 726–27 (Colo. 1975) ("'[O]ur legislature intended to extend the jurisdiction of our courts to the fullest extent permitted by the due process clause . . . .'  Therefore, the only question which we must determine is whether exercise of jurisdiction over the petitioner comports with the protection of the due process clause." (citation omitted) (quoting *Safari Outfitters, Inc. v. Super. Ct. In & For City & Cnty. of Denver*, 448 P.2d 783, 784 (Colo. 1968))).  Only one inquiry is said to be required because "we necessarily address the requirements of the long-arm statute when we engage in constitutional due process analysis." *Archangel Diamond Corp. v. Lukoil*, 123 P.3d 1187, 1193 (Colo. 2005); *accord Melea*, 511 F.3d at 1065 (stating that the Colorado long-arm

statute's "requirements are necessarily addressed under a due process analysis").

## 2. Due Process

The Due Process Clause requires the State to "exercise [only its] lawful power" over a defendant in "resolv[ing] disputes through judicial process." *J. McIntyre Mach., Ltd. v. Nicastro*, 131 S. Ct. 2780, 2786–87 (2011) (plurality opinion). "A court may subject a defendant to judgment only when the defendant has sufficient contacts with the sovereign . . . ." *Id.* More specifically, "we [must] ask whether the nonresident defendant has 'minimum contacts' with the forum state such 'that he should reasonably anticipate being haled into court there.'" *AST Sports Sci., Inc.*, 514 F.3d at 1057 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)); *see J. McIntyre Mach.*, 131 S. Ct. at 2789 ("Personal jurisdiction . . . restricts 'judicial power not as a matter of sovereignty, but as a matter of individual liberty,' for due process protects the individual's right to be subject only to lawful power." (quoting *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982))). "Establishment of minimum contacts with the forum state requires a showing [in the commercial context] that the defendant 'purposefully availed itself of the privilege of conducting activities within the forum State.'" *AST Sports Sci., Inc.*, 514 F.3d at 1057 (brackets omitted) (ellipsis omitted) (quoting *Hanson v.*

*Denckla*, 357 U.S. 235, 253 (1958)); *see Marcus Food*, 671 F.3d at 1166.[3]

Relatedly, "[i]n the tort context, we often ask whether the nonresident defendant 'purposefully directed' its activities at the forum state." *Dudnikov v. Chalk & Vermilion Fine Arts, Inc.*, 514 F.3d 1063, 1070 (10th Cir. 2008). The basic idea is to simply "ensure that an out-of-state defendant is not bound to appear to account for merely 'random, fortuitous, or attenuated contacts' with the forum state." *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)).

As relevant here, there are two ways by which a State may require a defendant to "submit to [its judicial] authority," *J. McIntyre Mach.*, 131 S. Ct. at 2787; *see id.* (noting that a person may "submit to a State's authority in a number of ways"). First, the forum State's courts may exercise general jurisdiction over a defendant "if [he] has 'continuous and systematic general business contacts' with the forum state." *Melea*, 511 F.3d at 1066 (quoting *Helicopteros Nacionales de Colombia v. Hall*, 466 U.S. 408, 414–16 (1984)). Second, "even in the absence of

---

[3] Under *Calder v. Jones*, 465 U.S. 783, 790 (1984), "[e]ach defendant's contacts with the forum State must be assessed individually," a point that the plaintiffs concede. Nevertheless, the plaintiffs argue that each defendant's contacts may be attributed to the other defendants through the doctrines of conspiracy, agency, and alter ego. The district court did not reach the plaintiffs' conspiracy, agency, and alter ego arguments. *See Grynberg*, 666 F. Supp. 2d at 1239 n.10 ("Because I have concluded that Plaintiffs have not demonstrated any independent basis for asserting personal jurisdiction over any individual defendant, I need not address Plaintiffs' theories of alter ego, agency, or conspiracy."). We likewise decline to reach these issues because the plaintiffs' arguments border on the conclusory and, more importantly, they have failed to show sufficient minimum contacts between *any* of the defendants and Colorado.

'continuous and systematic' contacts, a state's courts may exercise *specific jurisdiction* over a defendant that 'purposefully directed' its activities at the state's residents, if the cause of action arises out of those activities."[4]  *Id.* (emphasis added) (quoting *Burger King*, 471 U.S. at 472–73); *see Int'l Shoe Co. v. Washington*, 326 U.S. 310, 319 (1945) (noting that a State's authority extends to matters which "arise out of or are connected with the [defendant's] activities within the state").

_____

[4]      "Several circuits have taken the view that the determination of specific personal jurisdiction is a claim-specific inquiry. . . .  Thus, a conclusion that the court has personal jurisdiction over one defendant as to a particular claim does not necessarily mean that the court has personal jurisdiction over that same defendant as to other claims by the same plaintiff."  16 *Moore's Federal Practice* § 108.42[1], at 108-54–108-55 (2012) (citing *Seiferth v. Helicopteros Atuneros, Inc.*, 472 F.3d 266 (5th Cir. 2006); *Remick v. Manfredy*, 238 F.3d 248 (3d Cir. 2001); *Phillips Exeter Acad. v. Howard Phillips Fund, Inc.*, 196 F.3d 284 (1st Cir. 1999)).

Neither the district court nor the parties have broken out their specific-jurisdiction analysis by claim.  Unlike subject matter jurisdiction, we are not obliged to independently assess our jurisdiction over persons.  *See, e.g.*, *Williams v. Life Sav. and Loan*, 802 F.2d 1200, 1202 (10th Cir. 1986) ("A court has an obligation to dismiss a complaint for lack of subject matter jurisdiction. . . . .  We hold that a district court may not inquire into its personal jurisdiction and dismiss a case *sua sponte* except when entering a default judgment."); *cf. Viernow v. Euripides Dev. Corp.*, 157 F.3d 785, 793 n.16 (10th Cir. 1998) ("[T]he parties do not argue that the District of Utah lacked personal jurisdiction and, therefore, the issue is waived."); *Yavuz v. 61 MM, Ltd.*, 576 F.3d 1166, 1173 (10th Cir. 2009) ("Unlike objections to venue or personal jurisdiction, an objection on *forum non conveniens* grounds is not waived by a defendant failing to raise the issue in its first responsive pleading.").  Consequently, because the parties have not advanced their specific-jurisdiction arguments on a claim-by-claim basis, we have no need to opine regarding the appropriateness of this mode of analysis and about whether employing it might affect the outcomes that we reach here.

Finally, we must consider whether exercising personal jurisdiction over the defendant would nonetheless "offend traditional notions of fair play and substantial justice." *Dudnikov*, 514 F.3d at 1070 (quoting *Int'l Shoe*, 326 U.S. at 316) (internal quotation marks omitted). Traditional notions of fair play and substantial justice are not offended if the "district court's exercise of personal jurisdiction over a defendant with minimum contacts is reasonable in light of the circumstances surrounding the case." *AST Sports Sci., Inc.*, 514 F.3d at 1061 (quoting *Pro Axess, Inc. v. Orlux Distrib., Inc.*, 428 F.3d 1270, 1279 (10th Cir. 2005)) (internal quotation marks omitted).

### a. General Jurisdiction Over Mr. Friedland

The district court held that it did not have general jurisdiction over Mr. Friedland. It noted that "Plaintiffs only allege that this Court has general jurisdiction over Defendant Friedland because he has been a litigant in the Colorado courts numerous times in the past in relation to the clean up for the Summitville Mine Site," and found that "there is no legal authority supporting the notion that this should be sufficient to sustain general jurisdiction over [Mr.] Friedland. Rather . . . the pursuit of the litigation in Colorado does not constitute 'continuous and systematic general business contacts' with Colorado." *Grynberg*, 666 F. Supp. 2d at 1230–31 (quoting *OMI Holdings, Inc. v. Royal Ins. Co. of Can.*, 149 F.3d 1086, 1091 (10th Cir. 1998)). Further, the district court explained that "[Mr.] Friedland's litigation in Colorado all surrounded a single issue, *i.e.*,

-12-

the clean up costs for the Mine," and it declined to hold that "litigation related to a single separate issue is sufficient to confer general jurisdiction on a defendant for any and all future lawsuits in a forum state." *Id.* at 1231.

The plaintiffs argue that there were continuous and systematic general business contacts between Mr. Friedland and Colorado because he "(1) conducted continuous mining operations in Colorado for at least eight years; (2) asserted claims against the State of Colorado; (3) entered into a consent decree . . . ; and (4) systematically and repeatedly used the courts of Colorado for his benefit." Aplt. Opening Br. at 27. However, the plaintiffs have waived any argument that general jurisdiction may be exercised over Mr. Friedland based on his *operation* of the mine, as opposed to his associated litigation conduct.

In response to the defendants' motion to dismiss, the plaintiffs argued that "[Mr.] Friendland's [sic] contacts with Colorado began in 1996 . . . [when] Friedland sued and was sued by the State of Colorado . . . for reimbursement of cleanup costs of the Summitville Mine Site." Aplt. App. at 130–31 (Pls.' Resp. to Defs.' Am. Mot. to Dismiss for Lack of Personal Jurisdiction, filed Feb. 6, 2009). Accordingly, the district court explicitly noted that "Plaintiffs do not assert that [Mr.] Friedland is subject to general jurisdiction in Colorado based on his involvement with the Mine, rather they assert only that he is subject to general

-13-

jurisdiction for the subsequent Mine Litigation and recovery actions."[5]  *Grynberg*, 666 F. Supp. 2d at 1231 n.5.  The plaintiffs have not argued for application of the plain-error standard before us and, therefore, they can advance no further on their jurisdictional arguments regarding Mr. Friedland's mining-operation conduct.  *See, e.g.*, *Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011) ("[T]he failure to argue for plain error and its application on appeal[ ]surely marks the end of the road for an argument for reversal not first presented to the district court.").  In other words, such arguments are waived.  If the plaintiffs are to establish general jurisdiction over Mr. Friedland, they must do so based only on his litigation conduct.

"Because general jurisdiction is not related to the events giving rise to the suit, courts impose a more stringent minimum contacts test, requiring the plaintiff

---

[5]     The defendants correctly note that the plaintiffs "first made reference to [Mr.] Friedland's non-litigation involvement with the Summitville Mine in their surreply below."  Aplee. Br. at 38 n.21 (emphasis omitted).  Specifically, in their surreply, the plaintiffs stated that "[Mr.] Friedland's activities in Colorado stretch[] from his pollution of the Summitville area of Colorado," Aplt. App. at 709 (Pls.' Surreply to Defs.' Reply to Pls.' Resp. to Defs.' Am. Mot. to Dismiss, filed Mar. 19, 2009), and that "his contacts with Colorado began with his disastrous pollution of the Summitville mine area 20 years ago," *id.* at 711.  The district court was not obliged to consider such late-blooming contentions.  *See, e.g.*, *Stump v. Gates*, 211 F.3d 527, 533 (10th Cir. 2000) ("This court does not ordinarily review issues raised for the first time in a reply brief."); *see also Venuto v. Carella, Byrne, Bain, Gilfillan, Cecchi & Stewart, P.C.*, 11 F.3d 385, 388 (3d Cir. 1993) ("The district court properly exercised its discretion and refused to consider contentions first addressed in the sur reply memorandum.").

to demonstrate the defendant's continuous and systematic general business contacts." *Benton v. Cameco Corp.*, 375 F.3d 1070, 1080 (10th Cir. 2004) (quoting *OMI Holdings*, 149 F.3d at 1091) (internal quotation marks omitted); *see Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2855 (2011) ("[T]ies serving to bolster the exercise of specific jurisdiction do not warrant a determination that, based on those ties, the forum has *general* jurisdiction over a defendant."); *Marcus Food*, 671 F.3d at 1167; *Shrader*, 633 F.3d at 1243; *see also Doe v. Nat'l Med. Servs.*, 974 F.2d 143, 146 (10th Cir. 1992) ("[D]efendant's contacts with the state must be greater than those required for specific jurisdiction.").

This is a "high burden." *Benton*, 735 F.3d at 1081; *see Trierweiler v. Croxton & Trench Holding Corp.*, 90 F.3d 1523, 1543 (10th Cir. 1996) ("high threshold"); *see also* 4 Charles Allen Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1067.5, at 520 (3d ed. 2002) (opining that the Supreme Court's decision in *Helicopteros* "suggests very strongly that the threshold contacts required for a constitutional assertion of general jurisdiction over a nonresident defendant are very substantial, indeed"); *accord Tamburo v. Dworkin*, 601 F.3d 693, 701 (7th Cir. 2010). To establish general jurisdiction, "the commercial contacts here must be of a sort 'that approximate physical presence' in the state." *Shrader*, 633 F.3d at 1243 (quoting *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000)); *see Goodyear Dunlop Tires*

*Operations, S.A.*, 131 S. Ct. at 2853–54 ("For an individual, the paradigm forum for the exercise of general jurisdiction is the individual's domicile; for a corporation, it is an equivalent place, one in which the corporation is fairly regarded as at home.").

We have established four factors to consider in deciding whether general jurisdiction has been established:

> (1) whether the corporation solicits business in the state through a local office or agents; (2) whether the corporation sends agents into the state on a regular basis to solicit business; (3) the extent to which the corporation holds itself out as doing business in the forum state, through advertisements, listings or bank accounts; and (4) the volume of business conducted in the state by the corporation.

*Kuenzle v. HTM Sport-Und Freizeitgeräte AG*, 102 F.3d 453, 457 (10th Cir. 1996) (quoting *Trierweiler*, 90 F.3d at 1533) (internal quotation marks omitted); *see Doering v. Copper Mountain, Inc.*, 259 F.3d 1202, 1210 (10th Cir. 2001). Mr. Friedland's contacts with Colorado—all of which arise out of litigation over the Summitville Mine cleanup—satisfy none of these criteria.

First, as an indication of the "high burden" necessary to invoke general jurisdiction, *Benton*, 735 F.3d at 1081, we note that the Supreme Court has found such jurisdiction to exist just once, *see Perkins v. Benguet Consol. Mining Co.*, 342 U.S. 437 (1952). In *Perkins*, the Supreme Court permitted the exercise of general jurisdiction over a corporation whose president, general manager, and principal stockholder "carried on in Ohio a continuous and systematic supervision

-16-

of the necessarily limited wartime activities of the company." 324 U.S. at 448.

As subsequent Supreme Court decisions have emphasized, the company president

kept company files, held directors' meetings, carried on business correspondence,

distributed paychecks, and supervised policies regarding rehabilitation of the

company's Philippines properties from Ohio. *See Goodyear Dunlop Tires*

*Operations, S.A.*, 131 S. Ct. at 2856–57; *Helicopteros Nacionales de Colombia,*

*S.A.*, 466 U.S. at 415; *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 779 n.11

(1984); *see also Perkins*, 342 U.S. at 448.

The contrast between the contacts permitting general jurisdiction in *Perkins*

and Mr. Friedland's Colorado contacts is striking. The plaintiffs' allegations in

support of general jurisdiction contain none of the activities emphasized by the

Supreme Court. Instead, the plaintiffs rely on a "pattern of litigation, which

involved the commencement of at least four lawsuits in federal and state courts in

Colorado," Aplt. Opening Br. at 26, which the plaintiffs seek to "liken[] more to

an ongoing and integrated business plan than a mere chance encounter with the

Colorado courts," *id.* at 29. As the district court correctly noted, however,

"Friedland's litigation in Colorado all surrounded a single issue, *i.e.*, the clean up

costs for the Mine." *Grynberg*, 666 F. Supp. 2d at 1231.

Indeed, the limited case law on whether general jurisdiction can be based

on *litigation contacts* supports our conclusion that plaintiffs have failed to

establish general jurisdiction over Mr. Friedland. Most persuasive is *Soma*

-17-

*Medical International v. Standard Chartered Bank*, in which this court held that "fil[ing] five civil cases in Utah prior to 1992 to recover monies and/or foreclose on trust deeds" were not "the kind of 'substantial and continuous local activity' necessary to subject [a defendant] to general jurisdiction." 196 F.3d 1292, 1296 (10th Cir. 1999) (quoting *Arguello v. Woodworking Mach. Co.*, 838 P.2d 1120, 1122 (Utah 1992)). Similarly, in *United States v. Swiss American Bank, Ltd.*, the First Circuit applied federal law and found general jurisdiction lacking where, among other contacts, "in 1990, [defendant] was an appellant in a lawsuit in a [forum] court," but "ha[d] no office, personnel, or telephone number in the [forum]." 274 F.3d 610, 619–21 (1st Cir. 2001).

Following the reasoning of *Soma Medical* and *Swiss American Bank*, it cannot be said that Mr. Friedland's "general business" is mine-cleanup litigation; indeed, the plaintiffs allege that he is the "Executive Co-Chairman of Ivanhoe Energy Inc. and Executive Chairman of Ivanhoe Latin and Ivanhoe Ecuador." Aplt. App. at 338. In other words, his domestic litigation detours into Colorado do not amount to "continuous and systematic general business contacts" sufficient for the exercise of general jurisdiction. *Benton*, 375 F.3d at 1080 (quoting *OMI Holdings*, 149 F.3d at 1091) (internal quotation marks omitted).

Accordingly, we hold that the plaintiffs have failed to satisfy their burden to establish general jurisdiction over Mr. Friedland.

### b. Specific Jurisdiction

As explained above, a State may exercise specific jurisdiction over a nonresident defendant where the defendant purposefully directed its activities at the forum State's residents *and* the plaintiff's cause of action arises out of those activities. *See Dudnikov*, 514 F.3d at 1070. Because the plaintiffs cannot show that the defendants purposefully directed their activities at Colorado residents, we do not consider whether their claims arise out of the defendants' activities in Colorado.

### i. *Purposeful Direction*

In considering whether the defendants purposefully directed their activities toward Colorado, "we must examine [both] the quantity *and* quality of [their Colorado] contacts." *OMI Holdings*, 149 F.3d at 1092. One way to conduct this analysis in tort cases is to consider the "effects test" of *Calder v. Jones*, 465 U.S. 783 (1984),[6] where purposeful direction is established if three showings are made: the defendant (a) commits "an intentional action"; (b) that is "expressly aimed at the forum state"; (c) with "knowledge that the brunt of the injury would be felt in

---

[6]     Even though we have held that "*Calder* [does not] necessarily describe[] the only way to satisfy the purposeful direction test," where the plaintiffs "assert [that] it provides the key to unlocking the courthouse door for them," we may be content to "limit our attention . . . to *Calder*'s demands." *Dudnikov*, 514 F.3d at 1071. Here, the plaintiffs assert that the exercise of jurisdiction over the defendants comports with due process in light of *Calder*. *See* Aplt. Opening Br. at 18 ("[T]he record amply establishes a prima facie showing of each of the elements necessary to satisfy th[e] 'effects test.'"). We therefore follow *Dudnikov*'s instructive analysis and consider only *Calder*.

the forum state." *Dudnikov*, 514 F.3d at 1072; *see Shrader*, 633 F.3d at 1240–41; *accord Carrier Corp. v. Outokumpu Oyi*, 673 F.3d 430, 451 (6th Cir. 2012). Here, the plaintiffs fail to establish purposeful direction under the "effects test."

### a. Intentional Action

We have noted that the effects test requires the defendant to have committed an intentional act, but we have not decided "whether under *Calder* plaintiffs must also allege that the act itself was wrongful or tortious in some sense." *Dudnikov*, 514 F.3d at 1072. We need not decide this issue today because the plaintiffs have alleged that the defendants' intentional acts were wrongful or tortious:

> Defendants: (1) made knowing false representations to Plaintiffs; (2) stole Plaintiffs' confidential and proprietary information; (3) intentionally interfered with Plaintiffs' business and property interests; (4) negotiated with the Ecuadoran government personnel regarding Plaintiffs' concessions; and (5) unlawfully provided cash and valuable gifts to deprive Plaintiffs of their lawfully obtained mining concessions.

Aplt. Opening Br. at 18 (citations omitted); *see Dudnikov*, 514 F.3d at 1073 (avoiding the "th[e] thicket" of answering whether "any intentional act, wrongful or not, suffices under *Calder*" because the plaintiffs' complaint alleged wrongful conduct). Thus, the plaintiffs have satisfied *Calder*'s intentional-action requirement.

### b. Expressly Aimed at the Forum State

"[T]he 'express aiming' test focuses more on a defendant's

intentions—where was the 'focal point' of its purposive efforts—[as opposed to] . . . the consequences of the defendant's actions—where was the alleged harm actually felt by the plaintiff." *Dudnikov*, 514 F.3d at 1075. Although "[s]ome courts have held that the 'expressly aimed' portion of *Calder* is satisfied when the defendant 'individually target[s] a known forum resident,'" *id.* at 1074 n.9 (alteration in original) (quoting *Bancroft*, 223 F.3d at 1087), "[w]e have taken a somewhat more restrictive approach, holding that the forum state itself must be the 'focal point of the tort,'" *id.* (quoting *Far W. Capital*, 46 F.3d at 1080); *accord Chloé v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 172 (2d Cir. 2010) (holding that *Calder* was satisfied where the defendant committed an alleged trademark infringement expressly aimed at the forum state where the trademark owner was located).

The plaintiffs argue that "much of the tortious conduct on which Plaintiffs' claims are based was expressly and directly aimed toward Colorado."[7] Aplt. Opening Br. at 19–20. Although they identify conduct that is connected in an attenuated fashion to Colorado, they fail to establish that Colorado was the focal point of the defendants' torts. *Compare id.* at 20 ("Defendants made misrepresentations to Plaintiffs in Colorado and stole Plaintiffs['] confidential

---

[7] The plaintiffs also argue that this second prong is satisfied simply because "Defendants knew they were dealing with a Colorado resident." Aplt. Opening Br. at 19 (citing *Bancroft*, 223 F.3d at 1087). However, as noted, we have rejected this position. *See Dudnikov*, 514 F.3d at 1075.

and proprietary information under false pretenses in Colorado."), *with Dudnikov*, 514 F.3d at 1076 ("[D]efendants in our case *are* alleged to have *intended* their extra-forum conduct to reach and affect plaintiffs' business operations in Colorado."). In other words, although they lodge broad assertions that the defendant's conduct was "related" to Colorado, they do not explain how it was "expressly and directly aimed toward Colorado." Aplt. Opening Br. at 19–20

The *Dudnikov* court considered and rejected arguments similar to those raised by the plaintiffs here. In *Dudnikov*, the defendants argued that their conduct was not expressly aimed at the forum state of Colorado because they sent a notice of claimed infringement "not to plaintiffs in Colorado but to eBay in California." 514 F.3d at 1075. The court rejected this argument: "Defendants' express aim in acting was to halt a Colorado-based sale by a Colorado resident, and . . . the fact that they used a California-based entity to effectuate this purpose [does not] diminish this fact." *Id.* at 1076.

*Dudnikov* instructively compared two decisions of the United States Court of Appeals for the Ninth Circuit. Specifically, where defendant "sent a letter from its headquarters in Georgia to [plaintiff's domain name registrar] in Virginia," defendant expressly aimed its conduct at California "despite the fact that [the] letter was formally sent to Virginia" "because [defendant's] purpose was specifically to target a known California business." *Id.* (discussing *Bancroft*,

223 F.3d at 1087–88). By contrast, where defendant, an Ohio car dealer, used a California plaintiff's likeness without permission in an advertisement, defendant did not expressly aim his conduct at California "because the *intention*[] behind his advertisement was solely to entice local market Ohioans, not Californians, 'to buy or lease cars,'" *id.* (quoting *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 807 (9th Cir. 2004))—a factual situation unlike *Dudnikov*, where the defendants "*intended* their extra-forum conduct to reach and affect plaintiffs' business operations" in the forum state, *id.*

Following the reasoning in *Dudnikov*, the plaintiffs fail to show that the defendants expressly aimed their conduct at the forum state—here, Colorado. Specifically, "the 'focal point' of the alleged tort was Ecuador, where the oil field was located . . . and where Cotundo was injured when Ecuador allegedly cancelled Cotundo's concessions." Aplee. Br. at 19–20. For that reason, the plaintiffs do not satisfy the second prong of the *Calder* effects test.

c. Knowledge of the Location of the Brunt of Injury

The third prong "concentrates on the consequences of the defendant's actions—where was the alleged harm actually felt by the plaintiff." *Dudnikov*, 514 F.3d at 1075. The plaintiffs argue that the brunt of their injury was felt in Colorado because "[Mr.] Grynberg is a Colorado resident, and both Cotundo and RSM Production have their principal places of business in Colorado . . . [and] 90 percent of Cotundo's profits would inure to the exclusive benefit of Colorado

residents." Aplt. Opening Br. at 21.

It is unclear whether the plaintiffs' alleged harm was felt in Colorado. They previously characterized their injury as Cotundo's loss of the Pungarayacu concessions. *See* Aplt. App. at 133 ("[H]ere the injury is the loss of the Colorado Plaintiffs' contract rights to Pungarayacu . . . the loss of the Plaintiffs' Pungarayacu concession . . . ."). Indeed, the defendants persuasively argue that "neither [Mr.] Grynberg, RSM, nor Archidona owned the mineral concessions that were allegedly taken—Cotundo did—eliminating any possibility that they suffered direct injury anywhere, much less in Colorado." Aplee. Br. at 22 (citation omitted).

The plaintiffs, however, suggest that Cotundo's injury was felt in Colorado because Cotundo has its principal place of business there. *See* Aplt. Reply Br. at 4–5; *see also* Aplt. Opening Br. at 21 (citing *Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1131 (9th Cir. 2003)). Significantly, however, we have declined to find specific jurisdiction where, *inter alia*, "the enterprise was designed to use [non-forum state] resources to supply power to a [non-forum state] utility" because "there [was] no indication that [the forum state] had anything but a fortuitous role in the parties' past dealing or would have any role in their continuing relationship." *Far W. Capital, Inc.*, 46 F.3d at 1080. A reasonably cogent argument could be made that Colorado's relationship with Cotundo is similarly fortuitous. Moreover, in *Far West Capital*, we cited with

-24-

approval the Fifth Circuit's denial of personal jurisdiction where plaintiff had its principal place of business in the forum state because that business location was a "mere fortuity." *Id.* at 1079 (quoting *Southmark Corp. v. Life Investors, Inc.*, 851 F.2d 763, 773 (5th Cir. 1988)) (internal quotation marks omitted).

Given this analysis, the proposition that the brunt of the injury was felt in Colorado is dubious. However, even assuming that it was, the plaintiffs fail to establish—largely for the reasons stated in the immediately preceding subsection (i.e., the "expressly aimed" subsection)—that defendants had knowledge that this would be so. *Cf. Dudnikov*, 514 F.3d at 1074–75 (noting that there is "some overlap" between the "knowledge of location" element of *Calder* and the "expressly aiming" component, though "the overlap is far from complete"). At most they contend that the defendants "*could have foreseen* that the brunt of the injury caused by their conduct would be felt in Colorado." Aplt. Opening Br. at 21 (emphasis added). However, under *Calder*, that is not enough. *See Dudnikov*, 514 F.3d at 1077 ("We surely agree that under *Calder* the mere foreseeability of causing an injury in the forum state is, standing alone, insufficient to warrant a state exercising its sovereignty over an out-of-state defendant."). Accordingly, the plaintiffs fail to satisfy the third prong of the effects test. And, because the plaintiffs have not met the second or third prongs of the *Calder* effects test, they cannot establish purposeful direction under *Calder*.

ii. *Commission of a Tort*

The plaintiffs alternatively argue that "[u]nder Colorado law, where personal jurisdiction rests on the commission of a tort in Colorado, the minimum contacts analysis may be abbreviated because the commission of a tort, in itself, creates a sufficient nexus between a defendant and the forum state to satisfy the due process inquiry." Aplt. Opening Br. at 17 (quoting *Vogan v. Cnty. of San Diego*, 193 P.3d 336, 339 (Colo. App. 2008)) (internal quotation marks omitted). "In other words, conduct occurring outside the forum state (and even outside the United States) may form the basis for specific jurisdiction if the resulting injury was suffered in the forum state." *Id.* at 17–18.

The plaintiffs contend that the Colorado Supreme Court has "held that the commission of a tort, in itself, creates a sufficient nexus between a defendant and the forum state that satisfies the due process inquiry and establishes specific jurisdiction." *Goettman v. N. Fork Valley Rest.*, 176 P.3d 60, 69 (Colo. 2007); *see Found. for Knowledge in Dev. v. Interactive Design Consultants, LLC*, 234 P.3d 673, 681 (Colo. 2010). "In such cases," reason the plaintiffs, "there is no need for further minimum contacts analysis because the defendant is so connected with the forum state that traditional notions of fair play and substantial justice are not offended by the forum state's exercise of personal jurisdiction over the defendant." *Goettman*, 176 P.3d at 69.

Assuming that the plaintiffs are correct on the meaning of the latter phrase

-26-

in *Goettman—viz.*, that it implies, *without more*, that specific jurisdiction may be exercised where the resulting injury was suffered in the forum state—it is federal law, not Colorado's interpretation of it, that must ultimately determine whether the exercise of personal jurisdiction comports with due process requirements. *See RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1275–76 (7th Cir. 1997) ("When determining whether state courts would have jurisdiction [for purposes of determining whether the federal district court has jurisdiction] . . . , federal courts are under no obligation to defer to state court interpretations of federal law." (emphasis omitted)); *Stuart v. Spademan*, 772 F.2d 1185, 1189 (5th Cir. 1985) ("[T]he due process inquiry[ ]is governed by federal law . . . ."); *Data Disc, Inc. v. Sys. Tech. Assocs., Inc.*, 557 F.2d 1280, 1286 n.3 (9th Cir. 1977) ("[F]ederal law is controlling on the issue of due process under the United States Constitution."). This is so even if the plaintiffs' conception of *Colorado's* tort-effects test is less rigorous than *Calder* would permit. In that respect, as we have held, "the mere allegation that an out-of-state defendant has tortiously interfered with contractual rights or has committed other business torts that have allegedly injured a forum resident does not necessarily establish that the defendant possesses the constitutionally required minimum contacts." *Far W. Capital*, 46 F.3d at 1079; *see Trujillo v. Williams*, 465 F.3d 1210, 1219 (10th Cir. 2006) (citing *Far W. Capital*, 46 F.3d at 1078, 1079). For that reason, we cannot find that the requirements of due process are satisfied based *solely* on the defendants'

commission of a tort that involved Colorado entities. The *Calder* analysis above is also necessary.[8]

## B. Reconsideration of Denial of Jurisdictional Discovery

The district court denied the plaintiffs' motion for reconsideration of the denial of jurisdictional discovery, holding that they did not seek reconsideration based on a change in controlling law, nor did they establish that reconsideration was justified by new evidence that was previously unavailable or by the need to prevent manifest injustice. On appeal, the plaintiffs renew their arguments for reconsideration based on new evidence that was previously unavailable and the need to prevent manifest injustice.

### 1. Standard of Decision and Standard of Review

The plaintiffs' motion for reconsideration was filed under Federal Rule of Civil Procedure 59(e). We review the district court's denial of the plaintiffs' motion for reconsideration for an abuse of discretion. *See Brown v. Presbyterian*

---

[8] Because the plaintiffs fail to establish minimum contacts between the defendants and Colorado, we need not consider whether exercising personal jurisdiction over the defendants would be consistent with "traditional notions of fair play and substantial justice." *Soma Med.*, 196 F.3d at 1299 n.1 (quoting *Asahi Metal Indus. Co. v. Super. Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 113 (1987)) (internal quotation marks omitted); *cf. Shrader*, 633 F.3d at 1240 (suggesting that, even if the plaintiff has established "purposeful direction" and shown that the claim "arises out of" the defendant's activity with the forum, he must still show that the exercise of jurisdiction "would offend traditional notions of fair play and substantial justice" as a separate *and* necessary requirement (quoting *Dudnikov*, 514 F.3d at 1080) (internal quotation marks omitted)).

*Healthcare Servs.*, 101 F.3d 1324, 1331 (10th Cir. 1996). "[I]n determining whether to grant or deny a Rule 59(e) motion to alter or amend the judgment, the district court is vested with considerable discretion," *id.* at 1332, and we will reverse only if we have "a definite and firm conviction that the lower court made a clear error of judgment or exceeded the bounds of permissible choice in the circumstances," *id.* at 1331 (quoting *Moothart v. Bell*, 21 F.3d 1499, 1504 (10th Cir. 1994)) (internal quotation marks omitted); *accord Lambert v. Fulton Cnty., Ga.*, 253 F.3d 588, 598 (11th Cir. 2001).

"Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Servants of the Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). "Thus, a motion for reconsideration is appropriate where the court has misapprehended the facts, a party's position, or the controlling law." *Id.* However, "[i]t is not appropriate to revisit issues already addressed or advance arguments that could have been raised in prior briefing." *Id.* (citing *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir. 1991)); *see* 11 Wright, Miller & Kane, *supra* § 2817, at 180.

"When supplementing a Rule 59(e) motion with additional evidence, the movant must show . . . that the evidence is newly discovered [and] if the evidence was available at the time of the decision being challenged, that counsel made a diligent yet unsuccessful effort to discover the evidence." *Comm. for the First*

-29-

*Amendment v. Campbell*, 962 F.2d 1517, 1523 (10th Cir. 1992) (alteration in original) (quoting *Chery v. Bowman*, 901 F.2d 1053, 1057 n.6 (11th Cir. 1990)) (internal quotation marks omitted). If the motion for reconsideration is based on "evidence arising after the initial ruling . . . the party's diligence in seeking the evidence is obviously not a consideration," but if the motion is based on "evidence available but not discovered at the time of the initial ruling . . . the moving party must show it diligently sought the evidence earlier." *Bell v. Bd. of Cnty. Comm'rs of Jefferson Cnty.*, 451 F.3d 1097, 1102 (10th Cir. 2006); *see Webber v. Mefford*, 43 F.3d 1340, 1345 (10th Cir. 1994) ("[I]f the evidence was available at the time summary judgment was granted, [the movant must show] that counsel made a diligent yet unsuccessful attempt to discover the evidence.").

### 2. New Evidence Previously Unavailable

The plaintiffs argue that the district court abused its discretion in denying reconsideration based on new evidence that was previously unavailable. Specifically, they rely on their discovery of newspaper articles dated July 16, September 7, and September 9, 2009, and their receipt of an e-mail dated October 7, 2009, from the author of the July 16 and September 9 articles. Each of the three newspaper articles significantly predates the district court's September 30, 2009, order—and that date (i.e., the date of the order) is the date that is critical to the new evidence analysis. *See Bell*, 451 F.3d at 1102 (noting "evidence available but not discovered at the time of the initial ruling"); *Webber*, 43 F.3d at 1345

-30-

(discussing "the evidence [that] was available at the time summary judgment was granted"); *Campbell*, 962 F.2d at 1523 (asking "if the evidence was available at the time of the decision being challenged" (quoting *Chery*, 901 F.2d at 1057 n.6) (internal quotation marks omitted)). Indeed, the plaintiffs concede that they saw the September 7, 2009, article three weeks before the district court entered its order. *See* Aplt. Opening Br. at 47 ("Plaintiffs' counsel acknowledged briefly seeing one of the articles three weeks before the entry of the district court's order . . . ."); Aplt. Reply Br. at 20 (acknowledging "Plaintiffs' counsel's fortuitous observation of the September 7, 2009 article just weeks before the district court's order"); Aplt. App. at 2037 n.2 (Pls.' Reply in Supp. of Mot. for Recons. & to Alter or Amend J. Pursuant to Fed. R. Civ. P. 59(e), filed Dec. 7, 2009) ("Counsel for Plaintiffs recall briefly seeing the September 7 article in the Denver Post on or around September 7, 2009.").

Although the plaintiffs did not receive the reporter's e-mail until October 7, 2009, it appears to have been written in response to an e-mail that they sent on October 7, 2009. While the e-mail in question did not exist until after the district court's order was issued, the underlying information it conveyed clearly did exist and seemingly could have been obtained from the reporter sooner had the plaintiffs been more diligent. *See id.* at 1442 (discussing reporter's research in July and September 2009). Indeed, the reporter's July 16, 2009, article was published more than ten weeks before the district court's order. Moreover, as

noted, the plaintiffs conceded that they timely saw the September 7, 2009, article, which itself was published more than three weeks before the district court issued its order.

The plaintiffs unpersuasively argue that their "inability to discover this evidence prior to the entry of the district court's order was not due to any lack of diligence on the part of Plaintiffs or their counsel, but rather to the very denial of jurisdictional discovery that Plaintiffs seek to set aside." Aplt. Opening Br. at 47. However, the plaintiffs subsequently obtained these materials without the benefit of jurisdictional discovery, belying their contention that jurisdictional discovery was necessary to obtain them. The plaintiffs argue—without citing any authority—that "the fact that the newspaper articles may have been available on the Internet prior to the entry of the district court's order [does not] render Plaintiffs' investigative efforts any less diligent." *Id.* at 48. But aside from requesting jurisdictional discovery, the plaintiffs do not indicate that they took *any* steps to obtain this information, and cannot justify their failure to follow-up on their timely discovery of the September 7 article.

We conclude that the district court did not abuse its discretion in finding that the plaintiffs did not satisfy their burden to show that they were diligent in searching for this evidence, which was available at the time of the district court's order.

### 3. Manifest Injustice

The plaintiffs make a conclusory argument—without citation to any authority whatsoever—that reconsideration is necessary to prevent manifest injustice. This is insufficient to demonstrate that the district court abused its discretion when it found that reconsideration was not necessary to prevent manifest injustice. *See Mincey v. Head*, 206 F.3d 1106, 1137 & n.69 (11th Cir. 2000) (noting that the "burden of showing an abuse of discretion" in the "refus[al] to alter or amend . . . [a] final judgment under Rule 59(e)" is a "'difficult' one" (quoting *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 408 (1990))).

## C. Jurisdictional Discovery

### 1. Standard of Decision and Standard of Review

"When a defendant moves to dismiss for lack of jurisdiction, either party should be allowed discovery on the factual issues raised by that motion. The trial court, however, is vested with broad discretion and should not be reversed unless discretion is abused." *Budde v. Ling-Temco-Vought, Inc.*, 511 F.2d 1033, 1035 (10th Cir. 1975). "As with the court's handling of discovery in other stages of litigation, in the context of a [motion to dismiss for lack of jurisdiction], '[w]e give the district court much room to shape discovery,'" *Breakthrough Mgmt. Grp., Inc. v. Chukchansi Gold Casino & Resort*, 629 F.3d 1173, 1188–89 (10th Cir. 2010) (second alteration in original) (quoting *Citizens for Responsibility & Ethics in Wash. v. Office of Admin.*, 566 F.3d 219, 225 (D.C. Cir. 2009)); *cf. id.* (applying the foregoing standard in the context of a motion to dismiss for lack of

subject matter jurisdiction), and "will not interfere with the trial court's exercise of its discretion to control its docket and dispatch its business except upon the clearest showing that the procedures have resulted in actual and substantial prejudice" to the plaintiff, *Budde*, 511 F.2d at 1035 (ellipsis omitted) (quoting *Eli Lilly & Co. v. Generix Drug Sales, Inc.*, 460 F.2d 1096, 1105 (5th Cir. 1972)) (internal quotation marks omitted); *see Bell Helicopter Textron, Inc. v. Heliqwest Int'l, Ltd.*, 385 F.3d 1291, 1299 (10th Cir. 2004) ("Given the very low probability that the lack of [jurisdictional] discovery affected the outcome of this case we find no abuse of the district court's discretion here."); *Frontera Res. Azer. Corp. v. State Oil Co. of Azer. Republic*, 582 F.3d 393, 401 (2d Cir. 2009) ("A district court has wide latitude to determine the scope of [jurisdictional] discovery . . . ." (quoting *In re Agent Orange Prod. Liab. Litig.*, 517 F.3d 76, 103 (2d Cir. 2008)) (internal quotation marks omitted)).

"[A] refusal to grant discovery constitutes an abuse of discretion if the denial results in prejudice to a litigant. Prejudice is present where 'pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is *necessary*.'" *Sizova v. Nat'l Inst. of Standards & Tech.*, 282 F.3d 1320, 1326 (10th Cir. 2002) (ellipsis omitted) (emphasis added) (citations omitted) (quoting *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 430 n.24 (9th Cir. 1977)); *see Breakthrough Mgmt. Grp., Inc.*, 629 F.3d at 1189; *accord Getz v. Boeing Co.*, 654 F.3d 852, 860 (9th Cir. 2011).

-34-

The district court does not abuse its discretion by denying jurisdictional discovery where there is a "very low probability that the lack of discovery affected the outcome of this case." *Bell Helicopter Textron, Inc.*, 385 F.3d at 1299. "[T]he burden of demonstrating a legal entitlement to jurisdictional discovery—and the related prejudice flowing from the discovery's denial—[is] on the party seeking the discovery . . . ." *Breakthrough Mgmt. Grp., Inc.*, 629 F.3d at 1189 n.11; *see id.* at 1189–90.

## 2. Analysis

At a scheduling conference held February 10, 2009, the magistrate judge stayed discovery. He did so after hearing argument from the parties' counsel. In particular, regarding jurisdictional discovery, the magistrate judge understood from certain comments of plaintiffs' counsel—including his suggestion that jurisdictional discovery may be "premature" until the district court judge ruled on motion to dismiss, Aplt. App. at 687 (Scheduling Conference Tr., dated Feb. 10, 2009)—that plaintiffs did not "need jurisdictional discovery" at that time, *id.* at 688. Plaintiffs' counsel did not dispute the magistrate judge's understanding of plaintiffs' position. And, thereafter, the magistrate judge orally summarized his ruling:

> As I understand the statements of counsel this morning, no one needs discovery on jurisdictional issues at this time. *There may be a point, depending on how Judge Miller rules on the jurisdiction issues, where that discovery may be necessary to bring a defendant back into the case should that defendant be*

> *dismissed without prejudice* or for a defendant to try to establish later on that jurisdiction doesn't exist based upon discovery, and so I make no judgement about discovery later on on the jurisdictional issues, but I find that no discovery is necessary and I will not allow any on jurisdictional issues at this time.

*Id.* at 690 (emphasis added).

On March 16, 2009, the plaintiffs moved to lift the stay and obtain jurisdictional discovery. The magistrate judge denied the plaintiffs' motion at an April 3, 2009, hearing. The magistrate judge explained that the motion came "too late in the process" in light of the "enormous number of briefs filed on this jurisdictional issue" and the plaintiffs' statement at the February 10, 2009, hearing that "no discovery was necessary [but] if Judge Miller ruled in some certain way then there might be some discovery necessary." *Id.* at 1186 (Mots. Hr'g Tr., dated Apr. 3, 2009). He also explained "that the requested discovery appears to present a low probability of impacting the determination of the jurisdictional issue. . . . Largely the requests seem to me to be . . . irrelevant to the issue." *Id.* at 1186–87.

The district court held that the magistrate judge acted within his discretion, stating that it was reasonable for him to rely on the plaintiffs' statement that jurisdictional discovery could be stayed until after the district court ruled on the motion to dismiss, and that the requested discovery was "largely irrelevant to the jurisdictional issues now before the court." *Grynberg*, 666 F. Supp. 2d at 1228.

The plaintiffs now argue that they were prejudiced by being unable to

obtain jurisdictional discovery about the defendants' contacts with Colorado, "the agency and/or alter ego relationship among each of the Defendants," and "the facts necessary to link Defendants together for purposes of jurisdiction under Plaintiffs' alternative jurisdictional theory of conspiracy." Aplt. Opening Br. at 39. The plaintiffs further argue that they did not waive their right to jurisdictional discovery by agreeing that it could be deferred until after the district court ruled on the motion to dismiss. We reject the plaintiffs' arguments.

First, rather than finding waiver, the district court "reasonably t[ook] into account [the plaintiffs'] extensive delay and shifting positions in denying" jurisdictional discovery. Aplee. Br. at 47. As noted, district courts enjoy broad discretion to manage discovery, including jurisdictional discovery related to motions to dismiss for lack of jurisdiction. The plaintiffs filed their motion only after the parties completed extensive briefing; they acknowledged that they did not need jurisdictional discovery at that time and actually would not until after the district court ruled on the defendants' motion to dismiss. Accordingly, the court did not abuse his discretion in denying the plaintiffs' motion as untimely. *Cf. Breakthrough Mgmt. Grp., Inc.*, 629 F.3d at 1190 ("BMG then essentially conceded that BMG had not been prejudiced by the lack of discovery. Not only did counsel express a desire to go forward with the hearing, but . . . stated that, based solely on the evidence presented at the hearing, he was 'confident . . . that the Court will see how the documents at hand . . . establishes this case.'" (second

-37-

ellipsis in original) (quoting Aplee. Supp. App. at 123)).

Moreover, the district court correctly ruled that the plaintiffs' broad discovery requests "[we]re not tailored to address the limited question of personal jurisdiction." *Grynberg*, 666 F. Supp. 2d at 1228. The plaintiffs "do[] not tell us what specific documents [they] would have sought in discovery." *Breakthrough Mgmt. Grp., Inc.*, 629 F.3d at 1190. The plaintiffs' most specific contention on appeal is that they "sought information regarding: (1) the frequency and degree of [Mr.] Friedland's physical contacts with Colorado . . . ; (2) the extent of Friedland's purposeful availment of Colorado courts . . . ; (3) the observation of corporate formalities, financial structure, and relationship among each of the Defendants . . . ; and (4) agreements and communications among Defendants relating to the subject matter of this lawsuit . . . ." Aplt. Opening Br. at 42–43; *see id.* at 40, 42. They curiously comment that "[w]ithout knowing what such discovery would have uncovered, Plaintiffs were left to wonder what they may have learned and how that information may have altered the court's decision." *Id.* at 43. At worst, this statement takes the plaintiffs perilously close to conceding "an attempt to 'use discovery as a fishing expedition' rather than to obtain needed documents to defeat" the motion to dismiss. *Breakthrough Mgmt. Grp., Inc.*, 629 F.3d at 1190 (quoting *Anthony v. United States*, 667 F.2d 870, 880 (10th Cir. 1981)). At best, it fails to offer a sound basis for refuting the district court's reasoning that the requested discovery was "largely irrelevant to the jurisdictional

issues . . . before the court." *Grynberg*, 666 F. Supp. 2d at 1228. Consequently, the plaintiffs have failed to show that the district court abused its discretion in denying them jurisdictional discovery.

**D.    Transfer**

The plaintiffs challenge the district court's denial of their request in the alternative to transfer this action to the Eastern District of California. This court "review[s] the district court's decision on whether to transfer under a clear abuse of discretion standard." *Trierweiler*, 90 F.3d at 1543; *see Good v. Fuji Fire & Marine, Ins. Co.*, 271 F. App'x 756, 760 (10th Cir. 2008).

The federal transfer statute, 28 U.S.C. § 1631, provides that if a federal court determines that it lacks jurisdiction over a civil action or appeal, "the court shall, if it is in the interest of justice, transfer such action or appeal to any other such court in which the action or appeal could have been brought at the time it was filed or noticed." 28 U.S.C. § 1631; *see* 28 U.S.C. § 610 (defining "courts"); *In re Cline*, 531 F.3d 1249, 1251 (10th Cir. 2008). The transferor court must "first satisfy itself that the proposed transferee court has personal jurisdiction over the parties." *Viernow*, 157 F.3d at 793 n.16. If so, even though "§ 1631 contain[s] the word 'shall,' . . . the phrase 'if it is in the interest of justice' . . . grant[s] the [transferor] court discretion in making a decision to transfer an action or instead to dismiss the action without prejudice." *Cline*, 531 F.3d at 1251 (first alteration in original) (quoting *Trujillo*, 465 F.3d at 1222–23) (internal quotation

-39-

marks omitted).  Factors relevant to the interest-of-justice determination include "whether the claims would be time barred if filed anew in the proper forum, whether the claims alleged are likely to have merit, and whether the claims were filed in good faith or if . . . it was clear at the time of filing that the court lacked the requisite jurisdiction."  *Id.* (citing *Trujillo*, 465 F.3d at 1223 n.16).

### 1. Personal Jurisdiction in the Eastern District of California

The district court must "ascertain [whether] the proposed transferee court is one in which the action could have been brought at the time it was filed." *Viernow*, 157 F.3d at 793 n.16 (quoting 17 *Moore's Federal Practice* § 111.53 (Matthew Bender 3d ed.)) (internal quotation marks omitted).  The plaintiffs bear the burden to establish that the proposed transferee court—here, the United States District Court for the Eastern District of California—would have personal jurisdiction over the defendants.  *See Stanifer v. Brannan*, 564 F.3d 455, 459 n.1 (6th Cir. 2009) ("[I]n the absence of the ability to establish jurisdiction in the district in which the complaint was filed and faced with a motion to dismiss, it seems clear that the plaintiff would have the burden of proving grounds for a transfer."); *see also Good*, 271 F. App'x at 760 ("Transfer could not have served 'the interest of justice' because Ms. Good has failed to show that personal jurisdiction over these Japanese defendants would exist in any United States forum.").

The district court "note[d] that there is considerable dispute regarding

-40-

whether the California court would have jurisdiction over all of the Defendants," and was "hesitant to transfer the case to a court where the question of jurisdiction is not clearly established." *Grynberg*, 666 F. Supp. 2d at 1239. We conclude that the district court rightly declined to transfer this action because the plaintiffs have failed to show that the United States District Court for the Eastern District of California would have personal jurisdiction over the defendants.

"California's long-arm jurisdictional statute is coextensive with federal due process requirements." *Love v. Associated Newspapers, Ltd.*, 611 F.3d 601, 609 (9th Cir. 2010); *accord* Cal. Civ. Proc. Code § 410.10 ("A court of this state may exercise jurisdiction on any basis not inconsistent with the Constitution of this state or of the United States."); *Vons Cos. v. Seabest Foods, Inc.*, 14 Cal. 4th 434, 444 (1996) ("California's long-arm statute authorizes California courts to exercise jurisdiction on any basis not inconsistent with the Constitution of the United States or the Constitution of California."). As discussed above, the two-step due process analysis asks whether the defendant has sufficient minimum contacts with the forum state and whether exercising personal jurisdiction over the defendant is consistent with traditional notions of fair play and substantial justice.

The plaintiffs briefly argue that defendants Ivanhoe, IELA, and Mr. Martin are "subject to general personal jurisdiction in California," and that the plaintiffs' theories of "agency, alter ego, and conspiracy are sufficient to impute the[ir] general California contacts" to the remaining defendants, IEE and Mr. Friedland.

Aplt. Opening Br. at 52–53. The plaintiffs make an even more cursory argument in support of specific jurisdiction, arguing only that their "claims arise out of communications and representations made by Defendants in California, information sent to Plaintiffs from Defendants' businesses in California, and two meetings Defendants had with Ecuador government personnel in California," and that "[i]n conducting these activities, Defendants purposefully availed themselves of the privilege of conducting activities within California, and Plaintiffs' claims arise directly out of those forum-related activities." *Id.* at 52. These skeletal and conclusory arguments are not enough to undermine the force of the district court's reasoning, much less establish that the court's reasoning evinces an abuse of discretion.

Moreover, the plaintiffs make no argument whatsoever that it would be consistent with traditional notions of fair play and substantial justice for the California court to exercise personal jurisdiction over defendants. Accordingly, the plaintiffs have not met their burden to show that the United States District Court for the Eastern District of California would have personal jurisdiction over the defendants, so the district court rightly declined to transfer this action there.

### 2. Interest of Justice

Even if the United States District Court for the Eastern District of California had personal jurisdiction over the defendants, transfer would not be in the interest of justice. "[F]actors warranting transfer rather than dismissal . . .

-42-

include finding that the new action would be time barred; that the claims are likely to have merit; and that the original action was filed in good faith rather than filed after 'plaintiff either realized or should have realized that the forum in which he or she filed was improper.'" *Trujillo*, 465 F.3d at 1223 n.16 (citations omitted) (quoting *Trierweiler*, 90 F.3d at 1544).

The district court considered these factors and found that the first two factors weighed against transfer while the third factor weighed neither in favor of nor against transfer. *See Grynberg*, 666 F. Supp. 2d at 1239–40. The district court also found that "the interests of judicial economy d[id] not weigh in favor of transfer." *Id.* at 1240. We uphold the district court's determinations.

### a. Time-Barred in Transferee Court

The district court "note[d] that the parties agree that Plaintiffs action would not be time barred if filed in another district." *Grynberg*, 666 F. Supp. 2d at 1239. The plaintiffs acknowledge, in their motion to transfer, that they previously stated that this factor was not applicable to their case. *See* Aplt. Opening Br. at 55 n.14; Aplt. App. at 1236. However, the plaintiffs argue that "since the filing of that motion, eighteen months have passed, and additional time will pass while this appeal is pending," and that the plaintiffs would "face a substantial risk that their claims will now be time-barred in California." Aplt. Opening Br. at 55 n.14; *see id.* at 54–55.

That the plaintiffs' claims may *now* be time-barred is not relevant to

-43-

whether the district court abused its discretion in finding that transfer was not in the interest of justice. This court "do[es] not expect district courts to predict the future with absolute precision. Furthermore, in determining whether a district court abused its discretion, we review the record before the court at the time of its decision, not events allegedly occurring thereafter." *Mason v. Okla. Turnpike Auth.*, 115 F.3d 1442, 1458 n.13 (10th Cir. 1997), *overruled on other grounds by TW Telecom Holdings, Inc. v. Carolina Internet Ltd.*, 661 F.3d 495, 497 (10th Cir. 2011); *see Regan-Touhy v. Walgreen Co.*, 526 F.3d 641, 648 (10th Cir. 2008) ("We generally limit our review on appeal to the record that was before the district court when it made its decision . . . .").

Rather than sit on their hands for more than eighteen months, the plaintiffs could have safeguarded their interests by filing a protective suit in the Eastern District of California—particularly after the district court issued its order dismissing for lack of personal jurisdiction on September 30, 2009. "'[E]lementary prudence' should have prompted plaintiffs' lawyer to file a protective suit in a forum where personal jurisdiction was assured. Rather than file such a protective suit, [plaintiffs] . . . gambled their case on an extremely dubious theory of personal jurisdiction." *Saylor v. Dyniewski*, 836 F.2d 341, 345 (7th Cir. 1988), *superseded by statute on other grounds as stated in FMC Corp. v. Varonos*, 892 F.2d 1308, 1310 n.5 (7th Cir. 1990); *see McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1301 (D.C. Cir. 1996) ("[B]ecause of McFarlane's . . .

-44-

inexplicable failure to file a protective suit, we think the district court was within its discretion in denying a transfer."); *Cote v. Wadel*, 796 F.2d 981, 985 (7th Cir. 1986) ("Elementary prudence would have indicated to her lawyer that he must file a protective suit in Michigan because there was only a slight probability of obtaining personal jurisdiction in Wisconsin over the defendants. . . . We . . . remind plaintiffs and their counsel that they must determine where the plaintiff can get personal jurisdiction over the defendant before, not after, the statute of limitations runs; otherwise they court disaster.").  Accordingly, this factor weighs against transfer being in the interest of justice.

### b.    Whether the Plaintiffs' Claims Are Likely To Have Merit

"[A] court is authorized to consider the consequences of a transfer by taking 'a peek at the merits' to avoid raising false hopes and wasting judicial resources that would result from transferring a case which is clearly doomed." *Haugh v. Booker*, 210 F.3d 1147, 1150 (10th Cir. 2000) (quoting *Phillips v. Seiter*, 173 F.3d 609, 610–11 (7th Cir. 1999)); *see Cline*, 531 F.3d at 1252 ("Where there is no risk that a meritorious successive claim will be lost absent a § 1631 transfer, a district court does not abuse its discretion if it concludes it is not in the interest of justice to transfer the matter to this court for authorization."). "[I]t is a waste of judicial resources to require the transfer of frivolous, time-barred cases."  *Cline*, 531 F.3d at 1252 (citing *Phillips*, 173 F.3d at 610));

*accord Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 436 (2d Cir. 2005).[9]

The district court stated that its "review of the complaint does not convince me that the claims likely have merit. . . . [A]lthough I make no determination of whether Plaintiffs['] claims actually do have merit, I cannot say . . . that Plaintiffs['] claims as set forth in the Amended Complaint are 'likely to have merit.'" *Grynberg*, 666 F. Supp. 2d at 1239–40 (quoting *Trujillo*, 465 F.3d at 1223 n.16). The plaintiffs do not challenge the district court's initial assessment of the merits of their claims. Instead, they argue that the district court "erred in placing the burden of proof on Plaintiffs to demonstrate their claims are 'likely to have merit' rather than on Defendants to demonstrate that the claims were so clearly without merit as to support a finding that transfer was not in the interest of justice." Aplt. Opening Br. at 55–56. But it *is* the plaintiffs, not the defendants, who "have the burden of proving grounds for a transfer." *Stanifer*, 564 F.3d at 459 n.1. In that respect, they have failed to offer a reasonable basis for questioning the district court's finding, and their hollow assertions both in the district court and on appeal do not suffice to meet their burden.

Accordingly, the second factor also weighs against transfer being in the interest of justice.

---

[9] Neither *Haugh* nor *Cline require* a case to be "clearly doomed" for its transfer to weigh against the interest of justice. Rather, our touchstone is conserving judicial resources that would be wastefully expended by transferring cases that are *likely* without merit.

### c.  Whether the Plaintiffs' Action Was Filed In Good Faith

The district court "conclude[d] that there is at least some argument that this case was filed in Colorado even though Plaintiffs should have known that jurisdiction was not proper. . . . However, as these issues were at least somewhat difficult to resolve, . . . this factor neither weighs in favor [of] nor against transfer of the case." *Grynberg*, 666 F. Supp. 2d at 1240. The plaintiffs make a conclusory argument that "there is at least a good faith dispute as to whether Colorado was a proper forum for this action. There is no indication that Plaintiffs 'either realized or should have realized that [Colorado] was [an] improper [forum].'" Aplt. Opening Br. at 56 (alterations in original) (quoting *Trierweiler*, 90 F.3d at 1544). This argument provides this court with no basis to find that the district court improperly evaluated this factor.

### d.  Judicial Economy and Prejudice

The three factors set forth in *Trujillo* and *Cline* are not necessarily exclusive. *See Cline*, 531 F.3d at 1251 ("Factors considered in deciding whether a transfer is in the interest of justice *include* . . . ." (emphasis added)); *Trujillo*, 465 F.3d at 1223 n.16 ("[F]actors warranting transfer rather than dismissal . . . *include* . . . ." (emphasis added)). In addition to the three factors discussed above, the district court also considered whether the interests of judicial economy favored transfer, and concluded that they did not: "This case has not progressed beyond the issue of personal jurisdiction in Colorado and, therefore, little

-47-

pleading and no discovery will need to be repeated should Plaintiffs refile in California." *Grynberg*, 666 F. Supp. 2d at 1240. It was appropriate for the district court to consider the interests of judicial economy here.[10] *See* 14D Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3827, at 589 (3d ed. 2007) ("District courts also are likely to order transfer . . . if it would be more efficient or economical to do so . . . ."). The plaintiffs do not challenge the district court's judicial-economy finding on appeal.

They do claim, however, that the district court's dismissal of their action has subjected them to the defendants' motion for more than $800,000 in attorneys' fees and costs, and that this prejudice would have been avoided if the district court had transferred this action. But this is not the sort of prejudice that 28 U.S.C. § 1631 is concerned with. *Compare, e.g.*, *Goldlawr, Inc. v. Heiman*, 369 U.S. 463, 466 (1962) ("[T]his case is itself a typical example of the problem sought to be avoided, for dismissal here would have resulted in plaintiff's losing a substantial part of its cause of action under the statute of limitations . . . ."), *with*

---

[10]    As discussed above, such concerns also underlie the second inquiry—whether the plaintiffs' claims are likely to have merit. *See Cline*, 531 F.3d at 1252 ("[I]t is a waste of judicial resources to require the transfer of frivolous, time-barred cases." (citing *Phillips*, 173 F.3d at 610)); *Haugh*, 210 F.3d at 1150 ("[A] court is authorized to consider the consequences of a transfer by taking 'a peek at the merits' to avoid raising false hopes and wasting judicial resources that would result from transferring a case which is clearly doomed." (quoting *Phillips*, 173 F.3d at 610)).

*Witte v. Sloan*, 250 F. App'x 250, 254 (10th Cir. 2007) ("Although Mr. Witte complains about the financial burden of a second filing fee and having to redraft pleadings, these are not the severe burdens that motivated the enactment of § 1406(a).").

### e.    Balancing in the Interest of Justice

In sum, the district court properly found that the first two factors—whether the new action would be time-barred and whether the plaintiffs' claims likely have merit—weigh against transfer, and the plaintiffs make only a conclusory argument challenging the district court's finding that the third factor—whether they filed in good faith—was neutral.  Moreover, they do not challenge the district court's finding that judicial economy did not favor transfer, and their prejudice argument is without merit.

Accordingly, even if the plaintiffs could meet their burden to show that the United States District Court for the Eastern District of California would have personal jurisdiction over the defendants, the interest of justice weighs against transfer, and the district court did not abuse its discretion by declining to transfer this action.

## IV.  Conclusion

For the reasons set forth above, we **AFFIRM** the district court's

judgment.[11]

ENTERED FOR THE COURT

Jerome A. Holmes
Circuit Judge

---

[11] On August 23, 2011, defendants filed a Rule 28(j) letter, *see generally* Fed. R. App. P. 28(j), in which they requested (in the event that we affirmed the judgment and, consequently, they prevailed on appeal) that we "remand to the district court for the limited purpose of determining the amount of appellate fees and costs" to which they would be entitled under Colorado law. *See* Rule 28(j) Letter at 1. As plaintiffs correctly suggested in their letter in response (filed on August 31, 2011), a Rule 28(j) letter is not an appropriate vehicle for presenting for the first time a request for relief, and we do not condone the defendants' decision to employ a Rule 28(j) letter for this purpose. However, under the unique circumstances of this case, we deem it appropriate and prudent to exercise our discretion to grant the requested relief. Therefore, we **REMAND** the case to the district court for the limited purpose of computing a proper award of appellate fees and costs.